# EXHIBIT   3

Douglas Frost

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

------------------------------X

RONALD E. HOUSTON, et al.,      )

            Plaintiffs,      )

V.                              ) Case No.

URS CORPORATION, et al.,        ) 08 CV 203 (LO)(JFA)

           Defendants.      ) PAGES 1 - 143

------------------------------X

Deposition of DOUGLAS D. FROST, PE

Reston, Virginia

Wednesday, October 8, 2008

Reported by:

Denise Dobner Vickery, RMR, CRR

JOB NO. 189873A

Douglas Frost

Page 3

1   APPEARANCES:

2   For the Plaintiffs RONALD E. HOUSTON and JOSEPH

3   LOMASCOLO

4   Engstrom, Lipscomb & Lack

5        10100 Santa Monica Boulevard, 12th Floor

6        Los Angeles, CA 90067-4107

7        (310) 552-3800

8        rkinnan@elllaw.com

9   BY: Richard P. Kinnan, Esq.

10             -and-

11   Hall Sickels Frei Mims

12        12120 Sunset Hills Road, Suite 150

13        Reston, VA 20190

14        (703) 925-0500

15        gary.mims@hallandsickels.com

16   BY: Gary Brooks Mims, Esq.

17

18

19

20

21

22

Douglas Frost

1   For the Defendants URS CORPORATION, DEWBERRY & DAVIS

2   LLC and PARTNERSHIP FOR RESPONSE and RECOVERY

3   Hunton & Williams

4        1751 Pinnacle Drive, Suite 1700

5        McLean, VA 22102

6        (703) 714-7400

7        ssayers@hunton.com, mkinney@hunton.com

8   BY: Stephen M. Sayers, Esq.

9        Michael E. Kinney, Esq.

10

11   For the Defendants PARSONS BRINCKERHOFF, INC. and

12   ALLTECH, INC.

13   Jackson Lewis LLP

14        58 South Service Road, Suite 410

15        Melville, NY 11747

16        (631) 247-0404

17        mellkw@jacksonlewis.com

18   BY: Wendy J. Mellk, Esq.

19

20

21

22

Douglas Frost

Page 20

1    FEMA issues specific guidelines to PaRR to follow in

2    doing the disaster inspections; is that correct?

3         A.   They do issue specific guidelines per

4    disaster, correct.

5         Q.   Okay.   And PaRR then ensures that its

6    inspectors follow those FEMA guidelines?

7         A.   We distribute the guidelines to the inspectors

8    so they have an opportunity to look at them and make

9    sure that they complete the inspections to meet the

10   requirements of the guidelines.

11        Q.   Does PaRR have a review process to ensure that

12   a completed inspection complies with the FEMA

13   guidelines?

14        A.   Yes.   We do review some, sometimes all, of an

15   inspector's work after FEMA receives it.

16        Q.   And that's for purposes of ensuring that it

17   was done according to the FEMA guidelines?

18        A.   Yes, uh-huh.

19        Q.   Now, PaRR has standardized training and

20   instruction for the inspectors in terms of how to do an

21   inspection; is that correct?

22        A.   Our training is really focused on how to use

Douglas Frost

1    the equipment, the government-provided equipment that

2    is a requirement from FEMA for us to use, and then we

3    pass to our independent contractors to then use.   So

4    an awful lot of the training is focused on how to

5    utilize the equipment and walk through the inspection

6    process, you know, in a general -- general approach.

7         Q.   Does PaRR provide standardized training and

8    instruction both online and at various locations to its

9    independent contractors in order to be able to

10   implement the requirements of its primary contract with

11   FEMA?

12        A.   One more time.

13        Q.   I'm reading from your declaration.

14        A.   Yeah.

15        Q.   Okay.   Does PaRR provide standardized training

16   and instruction both online and at various locations to

17   its independent contractors in order to be able to

18   implement the requirements of its primary contract with

19   FEMA?

20        A.   Yes, it does.

21        Q.   Okay.   And are you at all involved in that

22   training?

Douglas Frost

Page 23

1    reporting certain information that FEMA requires to be

2    collected from applicants for federal disaster relief

3    who's -- is that correct?

4         A.   Uh-huh.  Yes.

5         Q.   Okay.   So, essentially FEMA issues guidelines

6    to PaRR for how to do -- how they want the inspections

7    to be done, correct?

8         A.   That's correct.

9         Q.   And PaRR then has these instructors who train

10   the inspectors to do the inspections a certain way,

11   correct?

12        A.   They train the inspectors on the information

13   that's required by FEMA to be collected.

14        Q.   And FEMA issues to PaRR and PaRR issues to the

15   inspectors a little hand-held computer to collect the

16   information, correct?

17        A.   That's correct.

18        Q.   And FEMA has in that computer its own little

19   software that has like forms and fill-in-the-blank

20   information to be collected, correct?

21             MR. SAYERS:   What do you mean by little

22   software?

Douglas Frost

Page 24

1                    MR. KINNAN:  Very good.

2     BY MR. KINNAN:

3         Q.  FEMA issues computers to PaRR to give to the

4     inspectors, correct?

5         A.  That's correct.

6         Q.  And there's proprietary software, FEMA's

7     proprietary software in the computer, correct?

8         A.  Software called ACE is in the computer and

9     it's a very complex software, but it is software

10    nonetheless.

11        Q.  And that's FEMA software?

12        A.  That's correct.

13        Q.  Is there any PaRR software in that computer?

14        A.  There is some PaRR software in the computer,

15    yes.

16        Q.  And that software is also kind of a checking

17    software to make sure that everything was collected

18    properly?

19        A.  Yes, that's correct.   Error checking

20    software.

21        Q.  And have you ever worked with this little

22    hand-held computer issued by FEMA?

Douglas Frost

Page 27

1        A.   Management Information System.

2        Q.   And who -- is that the FEMA software?

3        A.   No.   The FEMA -- that's the basic mother -- I

4    call it mother ship of servers that we communicate to.

5    That's not -- not part of the inspection pad.

6        Q.   Oh, I understand.   That's the receiving end?

7        A.   Correct.

8        Q.   Okay.   Well, can you think of anything that

9    is -- that the inspector sends over to FEMA that's not

10   through the computer and wired up?

11       A.   Nothing they send to FEMA.   I mean, they send

12   their inspection to FEMA.

13       Q.   Right.   Okay.   So, to kind of summarize then,

14   the inspector goes out with this hand-held computer,

15   completes the information required by the computer and

16   the complex software and then forwards that to FEMA,

17   correct?

18       A.   That's correct.

19       Q.   And how does PaRR then do its job to ensure

20   that the inspection was done according to FEMA

21   guidelines?

22       A.   We -- well, the error correcting software is

Douglas Frost

1    one method.

2        Q.   And how does that work?

3        A.   It's a series of very complex algorithms

4    that -- that were designed by a very smart guy and I'm

5    just a dumb engineer.   So I can't begin to tell you

6    how exactly it works but --

7        Q.   And I'm just a dumb lawyer, so I'm not going

8    to do any algorithms.   Mr. Mims, however, is an expert

9    on algorithms.   (Laughs.)

10       A.   The question was how do we then get the

11   inspection to review it; is that correct?

12       Q.   Yes, and how do you review it to ensure that

13   it complies with the FEMA guidelines?

14       A.   The way it happens is the information is

15   transmitted from the inspector to the NEMIS computer,

16   and then we have -- we, PaRR's reviewers, have the

17   opportunity to go in and selectively look at the

18   inspections, any, all or perhaps none, and we do that

19   by rights given to us from FEMA into the NEMIS system.

20   So we work in the NEMIS system.

21       Q.   With respect to the standardized training for

22   the inspectors, how extensive in terms of hours is

Douglas Frost

Page 29

1    that; do you know?

2         A.  Our --

3         Q.  I mean --

4         A.  Our training is an eight-hour kind of blitz

5    training and so it's a day-long course and we provide

6    them all over the country.

7         Q.  And once you complete that course, you get a

8    certification to become an inspector?

9         A.  Not necessarily.   We require some testing to

10   try to make sure the person has some level of

11   appreciation for the complexity of the job.

12        Q.  Okay.   And in addition to that standardized

13   training, does PaRR require the inspectors to review

14   the FEMA guidelines before they start doing their

15   inspections or are they just training the inspectors in

16   what the guidelines say?

17        A.  Well, the guidelines can change from disaster

18   to disaster and so there are some basic guidelines,

19   which generally we wouldn't have the time in an

20   eight-hour day to get -- to get too deep into the

21   guidelines.   Guidelines are learned by experience and

22   interpretation and some of them can be very confusing,

Douglas Frost

1    and so the guidelines are presented in each disaster

2    and there are may be subtle changes in the guidelines.

3         Q.   But there is an overall, you know, book of

4    FEMA guidelines, right?   It doesn't change from

5    disaster to disaster.   I know that there are

6    particulars for each disaster, but there are overall

7    guidelines, correct?

8         A.   There are overall guidelines.

9         Q.   And those -- doesn't PaRR somehow communicate

10   to the inspectors that they're to review those before

11   they do their inspections and you can get those on

12   their Website --

13        A.   Yeah.

14        Q.   -- and what have you?

15        A.   Yeah.   We have online training modules and we

16   encourage our inspector contractors to go online and

17   work through these online modules so they can become

18   the best inspector out there when the time comes for us

19   to deploy them.

20        Q.   And PaRR expects all of its inspectors to

21   complete each inspection in accordance with the

22   guidelines that are applicable to that disaster,

Douglas Frost

1    correct?

2                    MR. SAYERS:  You mean the FEMA

3    guidelines or other guidelines?

4    BY MR. KINNAN:

5        Q.  FEMA guidelines.  Are there other guidelines?

6        A.  No.   There are -- there are suggestions.  I

7    mean, we make suggestions to inspectors on you should

8    consider, you know, based on our top inspectors'

9    processes, we give them some -- well, I guess you could

10   call them -- well, no, you couldn't call them

11   guidelines.  We just give them some suggestions on how

12   to -- how to be proficient at executing the work.

13       Q.  Okay.  Understood.  But PaRR expects all of

14   its inspectors to complete their inspections in

15   accordance with the FEMA guidelines, correct?

16       A.  Yes.  Otherwise they would have an inspection

17   that failed to meet --

18       Q.  That's my next --

19       A.  -- the requirements of FEMA's NEMIS system and

20   so is the answer is, yes, they're expected to look at

21   the guidelines, to be familiar with the guidelines in

22   the execution of their work so they can try to get it

Douglas Frost

Page 33

1    where we do need to send it back and the inspector will

2    then go out and collect any missing information.

3        Q.  Okay.

4        A.  Or just provide the information whether he

5    actually goes back to do a reinspect or not.    It

6    varies.

7        Q.  But in any event, the object of reviewing the

8    inspection is to get it in compliance with the

9    guidelines that FEMA issued so they'll accept it and

10   they can process it?

11       A.  That would be correct.

12       Q.  Now, do you know generally what percentage of

13   inspections are not in compliance with the guidelines

14   and have to be reworked?

15       A.  I don't know on a percentage basis.    I can

16   tell you that we have a fairly large review staff, and

17   the reason we have a fairly large review staff is

18   because of the varying degree of and differences of

19   inspection work that comes up.    So we spend a lot of

20   time reviewing.    However, some inspectors aren't

21   reviewed at all.    They just blow right on past the

22   review and right into -- into what we, you know, what

Douglas Frost

Page 35

1    BY MR. KINNAN:

2        Q.   Okay.   The individual inspectors are provided

3    with government-owned and government-furnished

4    hand-held portable computers and digital cameras to

5    record the results of their inspections, correct?

6        A.   That's correct.

7        Q.   Now, have you ever heard the phrase broadcast?

8    Is there such a thing as a broadcast during a disaster?

9        A.   Yes.

10       Q.   Okay.   What is a broadcast?

11       A.   A broadcast is general information that's sent

12   to inspectors working out in the field to alert them of

13   -- and it could be a variety of reasons -- certain

14   areas having curfews, certain areas closed by the

15   police.   So that they don't waste their time trying to

16   get to an area that they can't get in.   It may have --

17   it may have a change in the guidelines that FEMA issued

18   after we had issued the basic guidelines specific to

19   that disaster.   It could have a request for inspectors

20   to please communicate their work.   There are a variety

21   of reasons.

22       Q.   And that broadcast comes from PaRR, correct?

Douglas Frost

Page 36

1      A.   That's correct.

2      Q.   So FEMA may ask PaRR to issue some kind of

3   change in the guidelines and then PaRR broadcasts that,

4   correct?

5      A.   That's correct.

6      Q.   And logistically how does this broadcast work?

7   My understanding is the inspectors are to call in a

8   certain number, phone number so many times a day and

9   then they listen to this broadcast; is that correct?

10     A.   There is -- yes, there's a mailbox.   Each of

11   the inspectors has a mailbox much like you would call

12   and check your voice mail.   Similar.

13     Q.   Does PaRR have a requirement that the

14   inspectors check that voice mail for broadcasts so many

15   times a day?

16     A.   It's not a requirement.   It's -- we suggest

17   that there could be changes that might affect their

18   ability to either execute more work or provide

19   information about safety issues and so they're

20   encouraged to check the broadcasts, whether there is a

21   broadcast or not, to keep up to -- up to date on any

22   new issues.

Douglas Frost

Page 39

1    serve the needs of these victims that have been

2    impacted by the disaster.   They provide a very

3    important role in getting assistance to people that

4    really have had their legs cut out from under them, and

5    so the quicker they can get out and get in the field

6    and do those inspections, the quicker FEMA can send

7    those folks some -- some money.   So there's a high

8    emphasis on get there, pick up your equipment and get

9    out and do your inspections.

10        Q.   So, one of the guidelines from FEMA to PaRR

11    and then PaRR to the inspectors is you get an

12    inspection, you have to complete that inspection within

13    72 hours?

14        A.   That's correct.

15        Q.   Okay.   And part of the oversight that PaRR

16    has in the field is to get them moving toward that

17    goal?

18        A.   Well --

19             MR. SAYERS:   Objection to the form of

20    that question.   You said oversight in the field.   I

21    don't think that's consistent with what his testimony

22    was.

Douglas Frost

1              THE WITNESS:  It's not oversight.  It is

2    coordination.

3    BY MR. KINNAN:

4         Q.  Okay.  And how do you coordinate?

5         A.  Well, understand that these inspectors do not

6    have possession of this equipment when -- when they go

7    to the field.   They have to meet somewhere and pick up

8    the equipment so that they can then begin to do their

9    inspections.   There are also last minute changes and

10   safety information that we want to convey to these

11   contractors and that information is available at the

12   field office, also.

13            Can I add something else --

14        Q.  Oh, sure.

15        A.  -- while you're thinking?

16        Q.  Go ahead.   Go ahead.

17        A.  One of the things that is kind of unique about

18   this contract is that the level of capability, the

19   abilities of these inspectors varies from people that

20   are, you know, just getting their feet wet to people

21   that have done this for who knows?  20, 25 years.   And

22   there is a lot of initial review assistance that we

Douglas Frost

1    provide the new inspectors.   They often are not able

2    to complete an inspection to the level of quality that

3    FEMA requires of PaRR and that we then require of the

4    independent contractors.

5         So we spend some extra time assisting them

6    with some of the areas where we've identified they may

7    have some deficiencies and some of them are very

8    deficient, and some of them just don't ever quite get

9    it.   And those folks generally usually on their own

10   admission figure out that I wasn't cut out for this,

11   and they -- they request to be sent home.

12       Q.  Okay.   So this review assistance, how is it

13   provided?   In the field or in an office or both or

14   what?

15       A.  It's provided in the field.   It can be

16   provided in the field as a ride-along, which you

17   mentioned earlier.

18       Q.  Yes.

19       A.  It could be provided in the field at our field

20   office location by what we call a team leader, and it's

21   somebody that just would sit down and walk through the

22   inspection, help -- help a new inspector understand

Douglas Frost

Page 43

1    ever want to do this again" or, you know, there's --

2    there's a thousand different reasons we're given on "I

3    don't want to go this time" or "I can't help you this

4    time."

5         Q.  Well, how many inspectors are on your list for

6    any given time, generally?   A hundred, a thousand,

7    10,000?

8         A.  Well, we --

9         Q.  How many approved inspectors?

10              MR. SAYERS:  You mean currently or as of

11   the date that the complaint was filed?

12   BY MR. KINNAN:

13        Q.  Both.

14        A.  I'm not sure that I can -- I'm not sure that I

15   can accurately answer that for the past.

16        Q.  Well --

17        A.  I can tell you that under the current

18   contract, the requirement for background clearances,

19   which is a fingerprint background clearance run through

20   the FBI, has reduced the number of inspectors available

21   for us to deploy and so --

22        Q.  When did that come into play?

Douglas Frost

Page 44

1        A.   That came into play on the recompete contract,

2   the current one.

3        Q.   2007?

4        A.   Yeah.   There was a background requirement in

5   the previous contract.   However, it was not -- it was

6   not executed through FEMA like the current one.   We

7   were able to use background clearance companies that

8   would go out and do background search on all the

9   inspectors, which was a requirement of the contract.

10   We had to do that and we did that.

11        Q.   Well, just so we can move on, just give me

12   your best estimate as to how many?

13        A.   A little over 3,000.

14        Q.   3,000?

15        A.   Uh-huh.

16                MR. SAYERS:   You mean as of now?

17                THE WITNESS:   As of now, correct.

18                MR. SAYERS:   All right.

19   BY MR. KINNAN:

20        Q.   Now, did PaRR have a requirement for the

21   inspector to agree to be deployed for a certain minimum

22   number of days once they accepted the deployment?

Douglas Frost

Page 45

1      A.  No, it's not a requirement.   We ask them for

2   a commitment up to 30 days.

3      Q.  What's the difference between a commitment and

4   a requirement?  My guys say they're required and then

5   --

6      A.  Well, I guess a requirement would have some

7   kind of penalty associated with it and a commitment

8   would be, you know, "You understand that you're doing

9   very important work here and these people that are out

10  there, these victims, rely on you to go out and help

11  them and that if you say you're going to go out for 30

12  days or three weeks and you don't, then, you know,

13  we're left in a position where we've got to go and find

14  somebody else who can come and finish your work."

15      And sadly, a lot of these folks come up with

16  reasons why they have to go home a week into it.   We

17  had many, many inspectors that if they can't find a

18  place to stay.  I mean, some of them work out of their

19  cars.   Others they're -- they're quite adaptive, but

20  other inspectors have mobile, you know, mobile homes

21  and work husband/wife times.   So they bring their own

22  -- their own living quarters.   So, again, they vary

Douglas Frost

Page 48

1    okay?

2         Does FEMA have a requirement for a minimum

3    number of inspections per inspector per day?

4         A.  They don't have a requirement.   They really

5    don't.

6         Q.  Does -- okay.

7         A.  FEMA does not -- FEMA doesn't care how many

8    folks we put out in the field, as long as we can meet

9    the three-day turn around.

10        Q.  And that involves FEMA sends to PaRR a certain

11   number of inspections and says, "We want these back in

12   three days"?

13        A.  Correct.

14        Q.  Okay.   Does PaRR have a requirement that an

15   inspector complete a certain number of inspections per

16   day?

17        A.  We have a -- we have a target and the target

18   is eight inspections.

19        Q.  And how is that relayed to the inspector?

20   What is said to the inspector?

21        A.  Well -- what is said to the inspector?   I

22   think it's generally known that the average is eight a

Douglas Frost

Page 49

1    day and so everybody -- you would expect everybody to

2    want at least hit the average, and the average allows

3    them to make a very healthy living at this work.

4        Q.   Does PaRR keep track of the time that the

5    inspector works each day in the field?

6        A.   Yes.

7        Q.   And how is that done?

8        A.   It's recorded on the inspector's invoice to

9    PaRR.   We request that they put the hours worked on

10   their invoice that they submit to PaRR.

11       Q.   And when does that invoice get transmitted?

12       A.   We ask them to try to send them up once a

13   week.

14       Q.   And on the invoice, it requests -- what hourly

15   -- what are they asked to put in there on the invoice?

16       A.   They're asked to put the number of inspections

17   that they're invoicing for, and there are a couple of

18   different types of inspections and they have slightly

19   different rates.   And so, therefore, they're to record

20   X number of inspections at the agreed -- the agreed

21   contractor rate.

22       Q.   Okay.   That's a little different than my

Douglas Frost

1      ahead and answer the question, sir.

2      BY MR. KINNAN:

3          Q.  Well, let me ask the question.   Does FEMA

4      have a guideline that inspections are not to be done

5      after dark?

6          A.  They have -- yes, they do.

7          Q.  Okay.   And does PaRR pass that guideline on

8      to their inspectors?

9          A.  Yes, we do.

10         Q.  All right.   Does FEMA have a guideline for

11     the latest the inspector can call the applicant to set

12     up the appointment for the next day or whenever?

13         A.  I don't know if there's an actual guideline

14     for that.   It's more of a common sense that, you know,

15     you shouldn't be calling people after 9 or 10 o'clock

16     at night.

17         Q.  Okay.   Does PaRR have a guideline don't call

18     after 9 or 10 o'clock?

19         A.  Well, we pass on the common sense kind of

20     thing.   You know, these victims are already

21     victimized.   Don't be, you know, don't be bothering

22     them after reasonable telephone call hours, and I think

Douglas Frost

Page 53

1    most of us would agree that, you know, that's probably

2    somewhere in 10, could be 11.

3                MR. KINNAN:  Let's take a five-minute

4    break if that's okay.

5                MR. SAYERS:  Sure.

6                (Thereupon, a recess was taken.)

7    BY MR. KINNAN:

8        Q.  Let's go back on the record.

9            Okay.  There's something I want to follow up

10   on and that is that I understand that sometimes we have

11   these new inspectors and they need some -- after the

12   standardized course training in the field, they need

13   some assistance, maybe in the field or at the office

14   because it's kind of a complex process they have to go

15   through, right?  We have these newbies, so to speak,

16   right?

17       A.  That's correct.

18       Q.  Okay.  And then you have some more seasoned

19   inspectors who they just get it.  They know the

20   inspection process, they do it, and they can even

21   actually bypass PaRR altogether and just send it

22   straight to FEMA and everything goes beautifully.

Douglas Frost

Page 54

1      A.   That is also correct.

2      Q.   Okay.   So if I understand the distinction

3   between the two, you've got the same FEMA guidelines

4   and same inspection process that both of those two

5   groups of inspectors follow, correct?

6      A.   They -- yeah.   They're required to provide the

7   information in the computer to FEMA.   All the

8   information that's required, you know, everybody has to

9   fill it out.

10      Q.   So, basically the difference between the

11   newbies and the seasoned inspectors is, you know, how

12   fast they can do the inspection and how efficiently and

13   accurately they can do them?

14      A.   Right.   Quality, production, consistency.

15   Yes, that would be.

16      Q.   Right.   But the two groups are following the

17   same FEMA guidelines, the same inspection process,

18   correct?

19      A.   That's correct.

20      Q.   Okay.

21      A.   There's a third group.   Would you like to

22   know about the third group?   (Laughs.)

Douglas Frost

Page 55

1        Q.   Sure.

2        A.   There's a group of perm padders which are --

3        Q.   Ah, I missed it.

4        A.   Perm, perm.  P-e-r-m, perm.  Short for

5   permanent.  Padders.

6        Q.   I know what permanent is.   What's a padder?

7        A.   Pad is the device.

8        Q.   The computer?

9        A.   Yeah.

10       Q.   Permanent padders?

11       A.   Right.

12       Q.   What does it mean?

13       A.   Well, they're a group of folks that we send

14   out, you know, directly to the disaster.   They usually

15   go out on most every disaster and that's a third, you

16   know, there's -- well, they're all different, but this

17   is a group that showed proficiency in doing this work.

18   They're more reliable than some of the other folks.

19       Q.   Now, we talked about the newbies and the

20   seasoned veterans doing the inspections.   If I'm not

21   mistaken, they both get paid the same per inspection,

22   correct?

Douglas Frost

Page 56

1        A.   They do get paid the same and all the folks in

2    between those two extremes.

3        Q.   Get paid the same?

4        A.   Yes.

5        Q.   And can you tell me:   What is it per

6    inspection they get paid?   I know it changes by a few

7    cents every year or, you know, but generally what is

8    the average inspection payment for all these

9    inspectors?

10       A.   $50.

11       Q.   $50.   Does --

12            MR. SAYERS:   You mean currently?

13            MR. KINNAN:   Well, I think we were just

14   talking in a big picture.

15   BY MR. KINNAN:

16       Q.   Right?

17       A.   Yeah, it's varied over the years.

18       Q.   But it's around --

19       A.   It's 44.60 I think in an earlier contract and

20   now it's right around $50.

21       Q.   Okay.   Do the inspectors have any direct

22   communication with FEMA personnel?

Douglas Frost

Page 57

1        A.   Direct communication with FEMA personnel.

2        Q.   Of course in connection with the inspection.

3        A.   No.   On occasion, FEMA may do -- FEMA may

4   send representatives out to do quality control on an

5   inspector and so they may have, you know, that I guess

6   would constitute direct communication with FEMA because

7   they're dealing with a FEMA representative.   But

8   normally, no.

9        Q.  Is it accurate to say that the inspector makes

10  all on-site decisions in accordance with the guidelines

11  issued by FEMA?

12       A.   I'm sorry.   Could you say that again?

13       Q.  Is it accurate to state that the inspector

14  makes all on-site decisions in accordance with the

15  guidelines issued by FEMA?

16       A.   On-site decisions?   You're going to have to

17  clarify that because I don't know what an on-site

18  decision is.

19       Q.   The inspection decisions.   The decisions

20  relating to the inspection.

21       A.   Yes.

22       Q.   And so all inspectors get the same initial

Douglas Frost

1    training, correct?

2         A.  They all get the initial training -- the same

3    initial training with the nuances that may vary from

4    instructor to instructor.   That would be correct.

5         Q.  Understood.  And the process of completing an

6    inspection by inputting the information in the

7    computer, that doesn't change from inspection -- from

8    disaster -- one disaster to another, does it?   The

9    process.

10        A.  It can.

11        Q.  In what way?

12        A.  FEMA may put in a modification to their ACE

13   software.

14        Q.  For that particular disaster?

15        A.  Sometimes.

16        Q.  Now, that I understand, and I think we're

17   clear on that.   I think it's discussed a little bit in

18   the guidelines, but the general process is the

19   inspector at all of the disasters, whether it be a

20   flood or a tornado or a hurricane, what have you, they

21   follow the same process of conducting the inspection by

22   contact -- getting the inspection, contacting the

Douglas Frost

Page 59

1    applicant, going out introducing themselves, and then

2    turning on the computer and filling all the information

3    in that the computer asks for for that inspection and

4    sending it off to FEMA, correct?

5        A.  Well, I would say that the way they execute

6    the inspection work can vary from one inspector to the

7    next inspector.   I mean, they, you know, they may not

8    all make appointments the same way.   They may not all

9    route their inspections the same way.   In fact, they

10   have the ability to execute the work any way they see

11   fit, as long as the data that they collect meets the

12   requirements FEMA has prescribed, and we know that a

13   lot of inspectors do things differently and can still

14   end up with an acceptable inspection.

15       Q.  Okay.  And I understand that.   Okay.  But

16   the bottom line is that at any disaster in any region,

17   the inspector has to fill in all the requested

18   information that FEMA requests in that computer; is

19   that correct?

20       A.  Yes, they have to fill in the required

21   information in the computer.

22       Q.  And the computer just asks the questions and

Douglas Frost

Page 60

1    they are at the site and they fill it in?

2         A.  Well, I wish it was that simple, but as I

3    mentioned, the computer program ACE is very complex and

4    over the years FEMA has made it even more difficult

5    because it jumps around a lot and it's -- it could be a

6    real challenge.

7         Q.  Okay.   But the challenge is to fill in the

8    information requested by FEMA, correct?

9         A.  That's correct.

10        Q.  All right.   And that doesn't change from

11   region to region, disaster to disaster.   Whatever FEMA

12   requests in that computer, they're supposed to fill it

13   in?

14        A.  Other than the specific disaster guidelines,

15   which can be handed down right at the 12th hour and

16   sometimes after we even start working.   So they

17   sometimes change one of the guidance requirements that

18   then force the inspectors to do a workaround, so that

19   they can get the information they need in order to pump

20   it out of NEMIS and create a check or not create a

21   check and the value of the check.

22              So, it's just not a simple, you know, every

Douglas Frost

Page 64

```
 1    go to the electricity form and complete that and go to

 2    the roofing form and complete that.   That's -- they

 3    all do that; is that correct?

 4         A.  If they identify, you know, if there's a

 5    particular issue with one of those areas or one of

 6    those trades.   I guess what I'm saying is a lot of

 7    them walk right past them.   Don't even notice.

 8         Q.  Okay.   And I understand that.

 9         A.  Okay.

10         Q.  And I can appreciate that.  All I'm saying is

11    that FEMA has these guidelines that all the inspectors

12    are to go out and complete a roofing form, an

13    electrical form and a deferred maintenance form and so

14    on and so forth and, hopefully, they do it well and

15    it's sufficient; is that correct?

16         A.  They're all required to fill out the

17    information based upon the guidelines, and I guess -- I

18    guess my only point is that some of them may not know

19    that they're supposed to fill something out because

20    they didn't recognize it as a damage.

21         Q.  Or didn't study the guidelines well enough?

22         A.  No.   I'm talking individual judgment of an
```

Douglas Frost

Page 70

1    towards an average over a week, but if you're keeping

2    pace, eight is kind of, you know, eight inspections a

3    day is kind of a reasonable expectation for an

4    inspector.

5        Q.  Okay.   Basically you're saying here, you

6    know, Mr. Inspector, you can do whatever you want,

7    assuming or provided you satisfactorily complete a

8    certain number inspections in a set period of time.

9    What's the certain number of inspections and what's the

10   set period of time?

11       A.  Well, the expectation is that an inspector

12   could do 56 inspections in a week on that, you know,

13   eight a day.

14       Q.  Uh-huh.

15       A.  Now, they could do 16 inspections on one day

16   and not do any inspections the next day and do whatever

17   they want, but because it's, you know, we kind of -- we

18   just look kind of for an average and so there are some

19   days where they get more inspections.   Some days where

20   they get less inspections.

21       Q.  And inspectors are expected to work seven days

22   a week while they're deployed?

Douglas Frost

Page 71

1      A.  You know, there's no -- there's no requirement

2  for that.   These inspectors are engaged to go out

3  there and do as many inspections or as few inspections

4  as they determine that their -- that their financial

5  condition, you know, would dictate.

6          So there is a general expectation that eight a

7  day is pretty normal and most, if not all, inspectors

8  -- most inspectors should be able to do eight a day,

9  but not every day and not every week, and that 56

10  inspections in a week is -- is generally viewed as an

11  inspector that's, you know, running about average with

12  everybody else.

13      Q.  Okay.

14      A.  There will be lots of inspectors that get

15  fewer than that and there are lots of inspectors that

16  get more than that.

17      Q.  So, most inspectors, they work seven days a

18  week when they're deployed?

19      A.  You know, I don't know that.

20      Q.  Is there a requirement that they work seven

21  days a week?

22      A.  I don't believe there is a requirement.

Douglas Frost

Page 72

1      Q.  Is there an expectation?

2      A.  There could be an expectation.   There's an

3  expectation that they do 56 inspections, but, again, if

4  somebody is doing 16 a day, they'll do it in half the

5  amount of time.

6      Q.  Now, are there any rules regarding inspector

7  attire, what they wear or what they can't wear?

8      A.  Well, they're not rules.

9      Q.  Are they guidelines?

10      A.  They're -- no, they're more expectations.

11  FEMA -- FEMA has indicated that we want or they want

12  our independent contractor inspectors to be dressed

13  nicely.   Now, what constitutes nicely is one opinion

14  to the next, but they say, like, no cutoff shirts and

15  you shouldn't wear frayed, you know, old ratty clothes.

16          And the reason for that is that these victims,

17  -- this may be the first person that's knocked on their

18  door to provide them instance and so, you know, we want

19  to try to present a professional appearance at the

20  request of FEMA and, you know, in PaRR support staff,

21  we want to try to be the most professional we can at

22  this response.

Douglas Frost

Page 73

1    Q.  Now, with respect to the time an inspection

2    takes, is there an expectation or a rule or a guideline

3    for that?

4    A.  Well, there's a -- there's some history in it.

5    It's not a guideline.   Generally it's expected that an

6    inspection will take 30 to 45 minutes.   Some can be

7    done faster and some take longer, but if you, you know,

8    generally somewhere between a half an hour and 45

9    minutes.

10    Q.  Now, there is certain information that is

11    required to be collected during an inspection; is that

12    correct?

13    A.  That is correct.

14    Q.  And that is -- that comes from FEMA?

15    A.  Yes.

16    Q.  Does it come at all from PaRR?

17    A.  No.  We're just there to pass the guidelines,

18    the basic requirements of the inspection down to the

19    inspector.

20    Q.  And all the collected information goes into

21    the computer that's passed on to FEMA, correct?

22    A.  Not all the information.

Douglas Frost

1   producing high quality inspectors.

2       Q.  Understood.   Now, this FEMA-issued computer

3   to the inspector, is the inspector allowed to give that

4   to someone else to do the inspection?

5       A.  No.

6       Q.  And the inspectors have their work checked by

7   way of some quality controls?  Certain number of their

8   inspections are checked?   Yes?

9       A.  Yes, that's correct.

10      Q.  And they're checked for compliance with the

11  guidelines and completeness, I gather?

12      A.  That would be correct.   Call them quality

13  control.   Someone comes behind them on a -- on a more

14  or less random basis.  Although we have a requirement

15  to do a quality control inspection, a certain number

16  for each inspector.

17      Q.  And the quality control guys are seasoned

18  inspectors that really get it?

19      A.  That -- that would be correct, yes.

20      Q.  Now, the inspector's work doesn't -- is not

21  limited to just doing the inspection, correct?  There

22  are other components of the inspector's work?

Douglas Frost

Page 79

1          Q.   Right, but that's part of their job?

2          A.   But they go somewhere and communicate their

3      inspections when they're -- when they're complete.

4          Q.   And that's part of their job as well?

5          A.   Yes, uh-huh.

6          Q.   And of course getting, you know, to the house

7      that they're inspecting, that's part of their job?

8          A.   That is.

9          Q.   Okay.  Now, with respect to -- and, again,

10     very generally, the $50 an hour fee that they get, do

11     you have a breakdown for what that is compensation for?

12         A.   Sure.

13         Q.   And does it include overtime?

14         A.   It does.

15         Q.   Okay.

16         A.   In fact, inspectors have had access to that.

17     It's one of our policies.   P001.   It's been provided

18     to the inspectors --

19         Q.   So --

20         A.   -- and spells out exactly how that -- that per

21     inspection rate was derived.

22         Q.   So PaRR makes part of the fee the overtime

Douglas Frost

Page 80

1    that they may or may not work?

2        A.  Yes.  There's --

3        Q.  So, in a sense, PaRR anticipates that the

4    inspector will work overtime and they want to

5    compensate them for that in part of the fee?

6        A.  Yeah.  That's correct and it's fairly

7    healthy.  Thirty hours a week of overtime.  It's

8    built into the rate, and it meets the Service Contract

9    Act requirements, which was a requirement of the

10   contract.

11       Q.  Well, what about -- well, let me just ask you.

12   If you had to break down that fee, it includes making

13   your appointments, traveling, overtime, downloading,

14   uploading, doing the inspection, all that sort of

15   thing.  Have I missed anything?

16       A.  It seems complete, but . . .

17       Q.  Now, this PaRR software that reviews the

18   inspections, that exists, right?

19       A.  Yeah.  Error correcting software.

20       Q.  Error correcting software?

21       A.  Uh-huh.

22       Q.  ECS.  I mean, is that --

Douglas Frost

1    answered.

2              MR. KINNAN:  Again, it's foundation.

3    We can ask it again in a different place and I'm just

4    going to kind of build on it a little bit.

5              MR. SAYERS:  Well, that precise question

6    has been asked actually several times and it's been

7    answered several times.   Hence the objection.

8    BY MR. KINNAN:

9         Q.  Go ahead.

10        A.  We have -- again, we have training that's

11   provided by our recruiter trainers that are given,

12   PowerPoint slide presentations.

13        Q.  Okay.

14        A.  Much of it is in here.

15        Q.  Okay.  All I'm getting at -- so I was just

16   going to do a little foundation.   Yes, we have the

17   standardized training.   We've been all over.   Don't

18   have to go all it again.

19             But now the question is:   Is there advanced

20   training so that these inspectors get even better

21   training to follow these guidelines?

22        A.  Yes, there is advanced training.

Douglas Frost

1      A.  No.  You get more inspections based upon being

2    a high producer.

3      Q.  Okay.

4      A.  And less inspections if you're not able to

5    keep up.

6      Q.  But the detail is just with respect to the

7    FEMA guidelines and making sure you understand them and

8    follow them?

9      A.  Well, I'm not sure I understand the follow-up

10   part of that question.

11     Q.  Well, you said it's just more -- the advanced

12   training, just like it says, is it's more advanced,

13   it's more detailed.   I'm just making the general

14   statement.  It must be more detailed in terms of

15   understanding the FEMA guidelines for doing the

16   inspections?

17     A.  That would be correct.

18     Q.  All right.   What are -- if you know, what are

19   addendum?   They use that word for, you know --

20     A.  Yeah.

21     Q.  -- guidelines?

22     A.  They have addendums.   They have lots of

Douglas Frost

Page 127

1      Q.  All right.  Now, in connection with Mr.

2    Houston, was he in any sense what Mr. Kinnan has

3    referred to as a newbie, or was he one of those

4    seasoned guys that really get it, one of the QC-rated

5    inspectors?   Could you tell us that?

6      A.  Yeah.   Mr. Houston was actually one of our --

7    one of our top performers and someone that was in our

8    top probably one or two percent of inspectors.

9      Q.  Was he in the top one or two percent of

10   earners in, say, 2005 when he testified that he earned

11   over $118,000?

12     A.  Yes, he was one of our top earners.

13     Q.  And what percentile would you say he is?  The

14   top 25 percent, the top --

15     A.  No, he was in the top one or two percent of

16   the earners.

17     Q.  All right.  So, there are 98 percent of people

18   who worked as independent contractor inspectors who

19   earned less than he did?

20     A.  That would be correct.

21     Q.  You mentioned QC inspections, quality control

22   inspections.   Do you know whether Mr. Houston actually

Douglas Frost

Page 128

1    was one of those few inspectors that performed quality

2    control inspections in, say, 2005/2006?

3        A.   He did perform quality control inspections.

4        Q.   Does the fact that he was selected to perform

5    quality control inspections distinguish him from other

6    inspectors in any fashion who had not been so selected?

7                MR. KINNAN:   Vague and ambiguous.

8    Overbroad.

9    BY MR. SAYERS:

10       Q.   You can go ahead and answer the question.

11       A.   We select our top candidates to be quality

12   control inspectors.

13       Q.   Before filing his complaint, do you know

14   whether Mr. Houston ever informed PaRR that he believed

15   that he should be classified as an employee and be paid

16   overtime wages as opposed to an independent contractor

17   paid on a per inspection basis?

18                MR. KINNAN:   Beyond the scope.

19                THE WITNESS:   I've never heard that from

20   anybody, including Mr. Houston.

21   BY MR. SAYERS:

22       Q.   You gave some statistics about whether all

Douglas Frost

Page 129

1    inspectors who accepted requests for deployment

2    actually did so -- sorry -- who were -- strike that

3    ridiculous question.

4            You gave some testimony about the percentage

5    of inspectors offered for deployment who actually

6    accepted that.   Let me just ask a couple of questions

7    about that.

8            First, is there any requirement on the part of

9    people who sign up as independent contractors to accept

10   deployments, or is it a matter of independent choice?

11       A.   There's no requirement.   They -- sometimes

12   they go.   Sometimes they don't.

13       Q.   When an inspector is out in the field, is

14   there any PaRR representative or anyone else looking

15   over the shoulder of that independent contractor to see

16   what they're doing?

17       A.   No.   They independently conduct their

18   inspections.

19       Q.   You gave some -- you were asked some questions

20   by Mr. Kinnan about whether time spent making

21   appointments or time spent traveling was included in

22   the per inspection rate.   Was it or wasn't it?

Douglas Frost

Page 130

1          A.   Well, the inspector's time out in the field to

2     arrange for executing inspections is compensated for in

3     the per inspection piece rate, which was computed based

4     on the Service Contract Act rate.

5          Q.   Okay.   And that includes overtime as well?

6          A.   A fairly substantial amount of overtime.

7          Q.   Okay.   You also gave some testimony about the

8     differences inspector by inspector and the number of

9     assignments given to them.   Could you elaborate on

10    that a bit?

11               I mean, is it the fact that each inspector is

12    given the same number of inspections to do, or are

13    there different numbers of inspections assigned to

14    different inspectors based upon their track record, for

15    example?

16               MR. KINNAN:   Question assumes a fact not

17    in evidence.   Overbroad.

18    BY MR. SAYERS:

19         Q.   You can answer the question, sir.

20         A.   The inspection limits which we call inspection

21    limits are set based upon the inspector's proven or not

22    proven ability to execute either a large volume of

Douglas Frost

Page 131

1    inspections or a small volume of inspections.   The

2    ones that can execute more inspections per week per day

3    are given more inspections to execute.

4        Q.  So work flows to those most capable of

5    performing them?

6        A.  Yes, absolutely.

7        Q.  And isn't it a fact that Mr. Houston had

8    demonstrated that he was very capable of performing a

9    large number of inspections?

10       A.  Mr. Houston was one of our top inspectors,

11   producers.

12             MR. SAYERS:  Thank you.  I don't believe

13   I have any further questions.

14             MS. MELLK:  No further questions.

15             MR. KINNAN:  I have a couple of

16   follow-ups.

17    FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

18   BY MR. KINNAN:

19       Q.  I just want to be clear.  With respect to Mr.

20   Houston, when you say, "he was one of our top

21   inspectors," you mean he was one of our -- one of

22   PaRR's best inspectors in terms of efficiency and

Douglas Frost

Page 132

1   quality and numbers and all that good stuff?

2       A.  Yes.

3       Q.  All right.  Very well.   Now, PaRR has always

4   done a background check on its inspectors, correct?

5       A.  Correct.

6       Q.  Now, in 2007, there's a special Homeland

7   Security added layer.   I understand that, right?

8   Yes?

9       A.  Yes.

10      Q.  Now, did they do a background check on

11  Mr. Houston?

12      A.  They?

13      Q.  PaRR.

14      A.  PaRR, yes.

15      Q.  A criminal background check?

16      A.  Yes.

17      Q.  Okay.   Now, did you know that the felony

18  conviction was in 1988?

19      A.  What?

20      Q.  Mr. Houston's.

21      A.  No.

22      Q.  Did you know --

Douglas Frost

Page 141

1                  CERTIFICATE OF NOTARY PUBLIC

2          I, Denise Dobner Vickery, the officer before whom

3      the foregoing deposition was taken, do hereby certify

4      that the witness whose testimony appears in the

5      foregoing deposition was duly sworn by me; that the

6      testimony of said witness was taken by me in stenotypy

7      and thereafter reduced to typewriting under my

8      direction; that said deposition is a true record of the

9      testimony given by said witness; that I am neither

10     counsel for, related to, nor employed by any of the

11     parties to the action in which this deposition was

12     taken; and, further, that I am not a relative or

13     employee of any attorney or counsel employed by the

14     parties hereto, nor financially or otherwise interested

15     in the outcome of this action.

16

17

18                              Notary Public in and for the
                                Commonwealth of Virginia
19

20
       My Commission expires:
21     March 31, 2010
       ID - 126014
22

Esquire Deposition Services, LLC
DC 1-800-441-3376        MD 1-800-539-6398        VA 1-800-752-8979

Douglas Frost

Page 142

1   October 22, 2008

2   MR. DOUGLAS D. FROST
    c/o Stephen M. Sayers, Esq.
3   Hunton & Williams
    1751 Pinnacle Drive, Suite 1700
4   McLean, VA 22102

5   Re:  RONALD E. HOUSTON, et al. V. URS CORPORATION,
    et al.
6        DEPOSITION OF DOUGLAS D. FROST, PE

7   Dear Mr. Sayers:

8        Enclosed for review is a copy of the above
    referenced transcript.  Please have the deponent read
9   the copy of the transcript and sign the enclosed
    certificate of deponent.  Also enclosed is an errata
10  sheet which the deponent should use to note corrections
    and the reasons for such corrections.  This and any
11  additional errata sheets should be signed and dated by
    the deponent.
12
         The deponent has thirty days in which to read and
13  sign the transcript.  After the deponent has reviewed
    the copy of the transcript, please return the
14  certificate of deponent and any errata sheets to
    Richard P. Kinnan, Esq., Engstrom, Lipscomb & Lack,
15  10100 Santa Monica Boulevard, 12th Floor, Los Angeles,
    CA 90067-4107.
16
    Sincerely,
17


18


19
    Denise Dobner Vickery, RMR, CRR
20


21


22