IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| RONALD EUGENE HOUSTON, on behalf of himself and all others similarly situated, and JOSEPH LOMASCOLO, on behalf of himself and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>URS CORPORATION,<br>et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:08cv0203 (LO/JFA)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS PARTNERSHIP FOR RESPONSE
AND RECOVERY'S AND DEWBERRY & DAVIS LLC'S
BRIEF IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION
FOR CONDITIONAL CERTIFICATION OF THIS CASE
AS A "COLLECTIVE" ACTION**

Stephen M. Sayers (VSB No. 23066)
Thomas P. Murphy (VSB No. 30765)
Michael E. Kinney (VSB No. 65056)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
Telephone:  (703) 714-7400
Facsimile:  (703) 714-7410

James P. Naughton (VSB No. 25923)
HUNTON & WILLIAMS LLP
500 E. Main Street, Suite 1000
Norfolk, Virginia  23510
Telephone:  (757) 640-5300
Facsimile:  (757) 625-7720

*Counsel for the Defendants Partnership for Response and Recovery
and Dewberry & Davis LLC*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

RELEVANT FACTS ............................................................................................................... 4

ARGUMENT ......................................................................................................................... 17

    I.      STANDARD OF REVIEW FOR CONDITIONAL CLASS
            CERTIFICATION. ............................................................................. 19

    II.     HOUSTON HAS SHOWN THAT HE IS "SIMILARLY SITUATED"
            TO A CLASS OF HIGHLY SKILLED INDEPENDENT CONTRACTORS
            WITH LONG EXPERIENCE ................................................................ 19

    II.     HOUSTON IS NOT "SIMILARLY SITUATED" TO ANYONE WHO
            WORKED MORE THAN TWO YEARS AGO BECAUSE HE
            CANNOT PROVE ANY "WILLFUL" VIOLATION OF THE FLSA ................ 20

    IV.    HOUSTON HAS NO STANDING TO ASSERT COUNT II OF THE
            COMPLAINT BECAUSE ONLY THE SECRETARY OF LABOR MAY
            PROSECUTE A CLAIM FOR INJUNCTIVE RELIEF. ....................................... 29

CONCLUSION ....................................................................................................................... 29

## <u>TABLE OF CASES</u>

## CASES

*Anderson v. N. Roanoke Veterinary Clinic*,
No. 96-0250-R, 1997 U.S. Dist. LEXIS 12690 (W.D. Va. Aug. 1, 1997) ............21, 27

*Bell Atlantic Corp. v. Twombly*,
___ U.S. ___, 127 S. Ct. 1955 (2007) ..........................................................................23

*Castillo v. P&R Enterprises, Inc.*,
517 F. Supp. 2d 440 (D.D.C. 2007) .....................................................................20, 28

*Chao v. Self Pride, Inc.*,
232 Fed. Appx. 280 (4th Cir. 2007)............................................................................22

*Choimbol v. Fairfield Resorts, Inc.*,
475 F. Supp. 2d 557 (E.D. Va. 2006) .........................................................................19

*Cubias v. Casa Furniture & Bedding LLC*,
No. 1:06 cv 386, 2007 U.S. Dist. LEXIS 3380 (E.D. Va. Jan. 14, 2007)...................24

*De Luna Guerrero v. North Carolina Growers Association, Inc.*,
338 F. Supp. 2d 649 (E.D.N.C. 2004).................................................................21, 28

*Debejian v. Atlantic Testing Laboratories, Ltd*,
64 F. Supp. 2d 85 (N.D.N.Y. 1999) ...........................................................................23

*Dole v. Elliott Travel & Tours, Inc.*,
942 F.2d 962 (6th Cir. 1991) .....................................................................................25

*Forney v. TTX Co.*,
No. Civ. A. 05 C 6257, 2006 WL 1030194 (N.D. Ill. Apr. 17, 2006)........................18

*Frazier v. Courter*,
958 F. Supp. 252 (W.D. Va. 1997) .............................................................................29

*General Investment Corp. v. United States*,
823 F.2d 337 (9th Cir. 1987) .....................................................................................27

*Gustafson v. Bell Atlantic Corp.*,
171 F. Supp. 2d 311 (S.D.N.Y. 2001)...................................................................23, 25

*Holt v. Rite Aid Corp.*,
333 F. Supp. 2d 1265 (M.D. Ala. 2004) ...............................................................19, 26

*Martin v. Deiriggi,*
    985 F.2d 129 (4th Cir. 1993) ..................................................................24

*McLaughlin v. Richland Shoe Co.,*
    486 U.S. 128 (1988)...................................................................21, 22

*Moore v. United Parcel Serv.,*
    No. 303-CV-1399L, 2004 WL 2339792 (N.D. Tex. Oct. 15, 2004) ...........................23

*Parker v. Rowland Express, Inc.,*
    492 F. Supp. 2d 1159 (D. Minn. 2007)...........................................................19

*Pfaahler v. Consultants for Architects, Inc.,*
    No. 99 C 6700, 2000 WL 198888 (N.D. Ill. Feb. 8, 2000).........................................19

*Powell v. State of Florida,*
    132 F.3d 677 (11th Cir. 1998) ...................................................................29

*Reich v. Homier Distributing Co., Inc.,*
    362 F. Supp. 2d 1009 (N.D. Ind. 2005) ...........................................................19

*Reich v. Waldbaum,*
    52 F.3d 35 (2d Cir. 1995) .......................................................................25

*Sobczak v. AWL Indust., Inc.,*
    540 F. Supp. 2d 354 (E.D.N.Y. 2007) ...............................................................21, 28

*Truslow v. Spotsylvania County Sheriff,*
    783 F. Supp. 274 (E.D. Va. 1992) ................................................................22

*Williams v. Maryland Office Relocators,*
    485 F. Supp. 2d 616 (D. Md. 2007)................................................................22

## STATUTES

29 U.S.C. § 211(a) (1994)...................................................................29

29 U.S.C. § 216(b) (1994) ...................................................................29

29 U.S.C. § 217 (1994) ......................................................................29

29 U.S.C. § 255(a) (1994)....................................................................21

Section 530(a)(1)(A) & (B) of the Revenue Act of 1978,
    26 U.S.C. § 3401 note (1979) ..................................................................27

McNamara-O'Hara Service Contract Act of 1965,
41 U.S.C. §§ 351-58 (2008)..................................................................................................9

## MISCELLANEOUS

Charles J.F. Dickens, *David Copperfield* (1852)..............................................................23

## INTRODUCTION

When natural calamities such as hurricanes, wildfires or tornadoes, hit the Country, the President has the authority to declare the affected area to be a Federal "disaster area."  When the President does so, the Federal Emergency Management Agency ("FEMA") must act with great speed in arranging disaster aid to tens of thousands, and sometimes hundreds of thousands or more, victims whose houses have been destroyed or heavily damaged.  For the last 25 years, the daunting task of carrying out the high volume of time-sensitive emergency housing inspections necessitated by natural disasters has been assigned by the Government to various firms that have, in turn, used their own Independent Contractors to perform these inspections.  This is the very first case in which claims have been made that these emergency housing inspectors are, in reality, "employees" of those firms and, thus, entitled to "overtime" compensation for their work under the Fair Labor Standards Act ("FLSA").

The first Plaintiff, Ronald Eugene Houston ("Houston"), is a convicted felon who concealed his criminal past from the Defendant, Partnership for Response and Recovery ("PaRR"), and deceived it into signing an Independent Contractor Agreement ("ICA") authorizing him to do some of this inspection work.  The second Plaintiff, Joseph Lomascolo ("Lomascolo"), worked as a housing inspector under a separate ICA with the other Defendant, Alltech, Inc. ("Alltech").  PaRR and Alltech are the two primary Government contractors that currently provide emergency housing inspection services to FEMA during natural disasters. [1]

Houston and Lomascolo have renewed their motion for conditional certification of this single case as two separate "collective" actions under Section 216(b) of the FLSA.  Houston

---

[1]  In addition to PaRR and Alltech, three other defendants were named in this case.  (*See* Exhibit "K," June 6, 2008 "Brief In Response To Plaintiffs' Motion For Conditional Certification Of This Case As A 'Collective' Action" p. 2, n.1 & n.2.)  One, URS Corp., was dismissed by Order dated May 1, 2008.  The other two are Dewberry & Davis LLC ("Dewberry"), one of PaRR's partners, and Parsons Brinkerhoff Inc., the corporate parent of Alltech.

claims to represent a "PaRR Class" of "similarly situated" PaRR inspectors.  Lomascolo makes the same claims as to a class of "similarly situated" Alltech inspectors.[2]

Houston and Lomascolo were unsuccessful in their first effort to provide the Court with an adequate factual showing that either is "similarly situated" to other members of the proposed classes whose interests they claim to represent.  The Court permitted the Plaintiffs to conduct discovery in an attempt to develop facts showing that they are "similarly situated" to others.  The Court left the Plaintiffs in no doubt as to the information that it was expecting from them after the conclusion of this discovery:  "[l]et's find out what these investigators do, whether there are different levels of them, whether anybody works 8 hours a day.  Those are the types of things I am looking for."  (*See* Ex. "A," Transcript of Hearing, July 11, 2008, p. 25.)

Despite having conducted discovery of the designees of the two Government contractors named as principal Defendants, Houston and Lomascolo have nothing new to add to the arguments that they made last July.  Houston still relies upon the same seven off-the-shelf Declarations that contain no factual detail, but only bare-bones legal conclusions.[3]  The class that Houston seeks to have certified conditionally is diffuse and grossly overbroad.  It would consist of *every* PaRR inspector who ever did any kind of inspection work during the three years before the Complaint was filed.[4]  This would include individuals who did not work more than 40 hours

---

[2]  His deposition was not taken in this case, so PaRR knows very little about the putative "Alltech Class" representative, Lomascolo, other than that he applied to become a PaRR Independent Contractor, but was found to be insufficiently qualified.  (Ex. "M," Klause Decl., ¶ 59.)  Accordingly, Dewberry and PaRR do not address Lomascolo's claims against Alltech.  Alltech has made a motion to sever the two cases.  Dewberry and PaRR support that motion because this case is, in fact, two separate cases, with two separate alleged "employers" and different facts exist as to the two sets of proposed classes.

[3]  One of the Plaintiffs' Declarants, Damien Porche, filed a voluntary petition in bankruptcy on August 31, 2007, in the U.S. Bankruptcy Court for the Northern District of Georgia, No. 07-74106-jb.  (*See* Exhibit "G," 08/13/07 Voluntary Petition.)  This was before the Complaint in this case was filed.  To the extent that Mr. Porche had any claim against PaRR, that claim belonged to the estate in bankruptcy.  The Trustee of the estate in bankruptcy has never expressed any intention, however, to join this case on behalf of the estate.

[4]  As alleged in the Complaint, the "PaRR Class" is defined as "all persons who are or were ever employed by the Defendants URS Corporation, DEWBERRY & DAVIS LLC, or PARTNERSHIP FOR RESPONSE AND

in a week, and who have no FLSA claims at all.  Houston has made no effort to limit the

proposed class only to those who have overtime claims under the FLSA.  Additionally, discovery

has revealed that Houston is in no way "similarly situated" to the vast majority of people whom

he tries to lump in the overbroad class that he now claims to represent, namely those inspectors

who, according to his Complaint, had "little or no prior inspection experience, and little or no

disaster training or experience."  (Complaint, ¶ 25.)  Houston admitted, in his deposition, that

this has "never been true" of him.  In fact, he was among the top 1.8% of the most highly

experienced inspectors who worked as Independent Contractors for PaRR, and who were

sufficiently skilled and experienced to be asked to do "Quality Control" inspections.

Accordingly, if Houston is "similarly situated" to anyone, it is only to the top 1.8% of PaRR's

Independent Contractors who, like him, were sufficiently skilled and experienced to inspect other

inspectors' work by doing "Quality Control" inspections.

　　　　Furthermore, there is no basis to issue an "opt in" notice to inspectors who performed

services for PaRR three years before the Complaint was filed.  The FLSA's statute of limitations

is two years.  Only in extraordinary situations, involving "willful" violations of the FLSA, can

this two-year limitations period be extended to three years.  Houston has admitted that he is

aware of *no facts* to support the conclusory allegations made in Paragraphs 47 and 48 of his

Complaint that PaRR has supposedly committed a "willful" violation of the FLSA.  So, if this

Court were inclined to issue any notice to inspectors who are "similarly situated" to Houston,

that notice should be limited to the top 1.8% of PaRR inspectors who, like Houston, performed

services in the *two* years before the Complaint was filed.

---

RECOVERY (PaRR) as a housing disaster inspector to perform inspections in FEMA-declared disaster areas in the
United States and its territories during the period November 1, 2004 to the present."  (Complaint, ¶ 15.)

Finally, in Count II of his Complaint, Houston seeks prospective injunctive relief. Congress has given the Secretary of Labor the exclusive right to bring claims for injunctive relief under Sections 211(a) and 217 of the FLSA.  Accordingly, the claims made in Count II cannot be pursued in a "collective" action.

## RELEVANT FACTS

The parties have conducted extensive discovery since last July, so the Court does not have to rely just upon the conclusory (and contradicted) allegations of the Complaint, or the "cookie cutter" conclusory Declarations that were previously supplied by Houston.  He has not provided to the Court any other Declarations from anyone who wants to "opt in" to the class he proposes beyond the seven substantially identical Declarations he originally submitted six months ago.  There appears to be very little interest on the part of other PaRR inspectors in wanting to become plaintiffs.

### A.    Houston Was Only Able To Be A FEMA Housing Inspector Because He Lied About His Criminal Record.

As part of FEMA's program to administer federal disaster housing aid, housing inspectors perform a critical public service.  (*See* Ex. "L," Second Supplemental Declaration of PaRR, ¶ 2.) When natural disasters strike, people's possessions and homes are destroyed or heavily damaged. They find themselves in desperate circumstances and in need of immediate assistance.  Huge numbers of housing inspections have to be performed in a very short period of time, and it is vital to differentiate deserving claims from fraudulent claims or scams.  For obvious reasons, FEMA requires anyone wishing to work as a disaster housing inspector to undergo a criminal background check.  (*Id.*)  FEMA inspectors have access to disaster victims' homes and their confidential personal and financial information.  (*Id.*)  Neither FEMA nor PaRR can entrust this critical public service to individuals with criminal backgrounds.

In addition to the background check required by FEMA, PaRR requires its Independent Contractors to certify that they have never been "arrested for, charged with or convicted of" a felony. (*Id.*) Every time Houston signed a Task Order to do inspection work, PaRR required him to certify that he had "not been arrested, charged, or convicted of any felony charge as of the start date of th[e] task order." (*See* Ex. "B," Excerpts of 10/03/08 Deposition of Ronald E. Houston, p. 14.) When asked at his deposition if he had a criminal record, Houston testified that he did not. (*Id.* at p. 9.) It turns out, however, that Houston does have a criminal record. Contrary to the certifications he made to PaRR every time that he signed a Task Order, Houston had, in fact, been arrested for, charged with, *and convicted* of a felony. (*Id.* at p. 15.) A California jury convicted him of felony possession of cocaine base with intent to sell. (*Id.*) Houston also admitted that he was convicted by the same jury of the following additional crimes: (1) use of force or violence against a police officer; (2) resisting arrest; (3) carrying a loaded firearm in a vehicle; (4) carrying a concealed firearm without a license. (*Id.* at pp. 15-16) He claimed not to recall whether he had also been convicted of the charge of battery against a woman, Renée Hill. (*Id.* at p. 16.) The records obtained from the California courts, however, confirm that he had been arrested for, charged with, and convicted of, battery against Ms. Hill. (*See* Ex. "J," *California v. Ronald Houston*, Case No. A924892.)

Houston served six months in jail as a result of his convictions. (*Id.* at p. 1; Ex. "B," Houston Dep. at p. 17.) He never informed PaRR of these facts. (Ex. "B," Houston Dep. at p. 17.) It is not disputed that if Houston had truthfully informed PaRR about his criminal past, PaRR would never have entered into an ICA with him. (Ex. "C," Frost Dep. at pp. 121, 136-37;

Ex. "L," Sec. Supp. Decl. of PaRR, ¶ 7.)[5]  PaRR is not aware of any other of its Independent

Contractors who have a prior felony conviction.

### B.  Houston Has Repudiated Material Allegations of His Complaint.

Although Houston read the factual allegations in his Complaint, before it was filed, to

ensure that those allegations were accurate (Ex. "B," Houston Dep. at pp. 58-59), he now admits

that many of those factual allegations are untrue.  (*Compare* Complaint, ¶ 7 with Ex. "B,"

Houston Dep. at p. 63; Complaint, ¶ 28 with Houston Dep. at pp. 136-38 & 143-44; Complaint,

¶ 29 with Houston Dep. at p. 148; and Complaint, ¶ 31 with Houston Dep. at pp. 149-50, 151 &

153.)

By far the most significant admission made by Houston in this context goes to the very

basis of this "misclassification" case.  Houston's claim for overtime is that he was supposedly

"misclassified" as an Independent Contractor, rather than as an "employee."  The foundation of

this theory is the allegedly pervasive control that PaRR exercises over the daily activities of the

inspectors deployed to perform disaster housing inspections at federally-declared disaster sites.

At his deposition, however, Houston completely disavowed the allegation that PaRR inspectors

"have a total lack of independence over setting their work hours, work crews and other details of

their inspection work."  (Complaint, ¶ 34.)  He testified plainly: "[t]hat is not correct."  (Ex. "B,"

Houston Dep. at p. 153.)  He insisted that "*I had total independence over my work hours*."  (*Id.* at

p. 154) (emphasis added.)[6]  As to the inspectors described in the Complaint who claim that they

---

[5]  When Houston initially applied to PaRR to become an Independent Contractor, he was a resident of the State of
Nevada.  In the electronic application he filed, he certified to PaRR that he had never been arrested for, charged
with, or convicted of a felony.  (*See* Ex. "L," Sec. Supp. Decl. of PaRR, ¶ 3.)  A check of Nevada's criminal records
disclosed that he had no criminal record in that State.  Houston had, however, been previously convicted of a felony
in the California judicial system.  PaRR did not find out about this until after Houston had filed his Complaint**.**  (*Id.*
¶ 4.)  Dewberry and PaRR have now amended their original Answer to assert fraud in the inducement as an
affirmative defense.

[6]  In this respect, Houston *is* "similarly situated" to other PaRR Independent Contractors who have complete
independence over their work.  (*See* Ex. "N," Declaration of Debra Bone, ¶ 5; Ex. "O," Declaration of Donna Clark,

had a "total lack of independence," therefore, Houston is, by his own admission, not "similarly situated" to them.

### C.   Houston Was A Highly Experienced, Seasoned and Efficient Disaster Housing Inspector.

Before he became a PaRR Independent Contractor, Houston had developed unique and extensive inspection-related expertise.  This sets him significantly apart from the vast majority of inspectors.  He had done 13,000 to 14,000 disaster housing inspections for other firms (including Alltech) that were under contract to perform disaster inspection services for FEMA or its predecessor agencies within the United States Government.  (*Id.* at p. 38.)  Houston had done this work for seven years, between 1994 and 2001, before he first entered a contact with PaRR.  He signed his first ICA with PaRR in early January of 2002.  (*Id.* at p. 39.)[7]  Throughout the four years that he worked for PaRR – from 2002 to 2006 – Houston was, according to his own testimony, "a seasoned, experienced inspector." (*Id.* at pp. 75-76.)

### 1.   Houston Is Not "Similarly Situated" To The Inexperienced Inspectors Described In Paragraph 25 Of His Complaint.

In Paragraph 25 of his Complaint, Houston claimed that many individuals recruited by PaRR to work as Independent Contractors, "have little or no prior inspection experience and little or no disaster training or experience."  (*Id.* at p. 76.)  Houston conceded, however, that this "has never been true" of him.  (*Id.*)  He admitted that his situation was "totally different from those rookies who had little or no training or experience."  (*Id.*)  This places Houston in an entirely

---

¶¶ 7, 13; Ex. "P," Declaration of Eric Elza, ¶¶ 14, 15; Ex. "Q," Declaration of Clarence Ronald Graves, ¶¶ 11, 12; Ex. "R," Declaration of Hal Morgan, ¶¶ 9, 12; Ex. "S," Declaration of Mike Reilly, ¶¶ 4-5; Ex. "T," Declaration of James H. Stone, ¶ 14.)

[7] From 1986 to 1994, Houston was "on disability" as a result of a worker's compensation claim, and was out of work.  (Ex. "B," Houston Dep. at pp. 28-29.)  He testified that he was again "on disability" at the time of his deposition, and does not currently work for PaRR for that reason.  (*Id.* at 92.)  Although in response to a discovery request for prior worker's compensation claims, Houston's counsel previously informed PaRR's counsel that Houston "has not filed for worker's compensation" (*See* Exhibit "H," 9/18/08 Letter from Richard P. Kinnan, Esq., p. 2), Houston testified that he *had*, in fact, filed a worker's compensation claim (Ex. "B," Houston Dep. at p. 27).

different category from the mass of first-time inspectors retained as Independent Contractors by PaRR.  This vast experience, gained in over 13,000 to 14,000 inspections before he signed on as a PaRR inspector, enabled Houston to do many more inspections per-day than someone who was not as seasoned and experienced as he was.  (*Id.*)

### 2.   Houston Is Not "Similarly Situated" to Over 99% of Independent Contractors Who Earned Only A Fraction of the Money He was Able to Make.

Due to his uniquely extensive background and experience in the disaster housing inspection industry, Houston was able to make a *lot* more money than the vast majority of other inspectors.  (*Id.* at p. 102; Ex. "M," Declaration of Ronald P. Klause, ¶ 69.)  Indeed, Houston was among the most efficient and highly-paid of all of PaRR's inspectors.  (*See* Ex. "M," Klause Decl., ¶ 65.)  In 2005 alone, he was among the top 1% of earners of all Independent Contractors retained by PaRR to do FEMA disaster housing inspections.  He earned over $118,000 in that year.  (Ex. "C," Frost Dep. at p. 127; Ex. "M," Klause Decl., ¶ 61.)  Only fifteen of PaRR's Independent Contractors earned more than Houston in 2005.  (Klause Decl., ¶ 61.)[8]

### D.   Houston Has Come Forward With No Evidence That PaRR Has "Willfully" Violated the FLSA, and Undisputed Facts Show That This Allegation Is Demonstrably Untrue.

For at least the past quarter-century, every Government contractor that has provided emergency housing inspection services to FEMA (or its predecessor agencies) has retained Independent Contractors to provide those services.  (Ex. "M," Klause Decl., ¶ 6.)  The evidence

---

[8]  In addition, under its prime contract with FEMA, PaRR was required to implement a Cultural Diversity Plan.  (Ex. "M," Klause Decl., ¶ 70.)  Under this Cultural Diversity Plan, PaRR was required to steer work to those who had a particular language proficiency, social competency or minority status.  (*Id.*)  As an African-American, Houston was a beneficiary of this Plan, and he was asked to work more often, and to deploy to more disaster locations, than others who were not "similarly situated" to him.  (*Id.* at ¶ 71.)  As a result, he had the opportunity to make a lot more money than others who were not part of this Plan.  (*Id.*)

of this uniform and long-standing industry practice is uncontroverted.  (Ex. "B," Houston Dep. at

p. 88.)

### 1.   PaRR Consulted With The Department of Labor To Assure Its Compliance With Wage and Hour Laws.

Before signing its first contract with FEMA, PaRR was anxious to ensure that it would be

able to comply with all applicable federal wage and hour laws.  Before awarding a contract for

disaster inspection services, FEMA amended its Request for Proposals ("RFP") to require all

bidders to comply with a DOL determination.  (Ex. "M," Klause Decl., ¶ 13.)  For proposal

purposes, housing inspectors had to "earn no less than the minimum hourly wage of $20.00

PLUS fringes and overtime (time and a half), as applicable."  (*Id.*)  FEMA informed bidders,

however, that "[t]his does not preclude payment of Inspectors on a per inspection basis."  (*Id.*)  In

light of this new requirement, PaRR specifically asked FEMA whether Independent Contractors

could be used to provide inspection services under the contract, which had been the standard

practice in the industry for the previous twenty-five years.  (*Id.* at ¶ 14.)  FEMA directed PaRR

to a senior wage and hour analyst for the Department of Labor ("DOL"), Thomas Obert.  (*Id.*)

PaRR's contracts manager informed Mr. Obert that PaRR intended to use Independent

Contractors, and to pay them a per-inspection rate in line with the uniform practice in the disaster

inspection industry.  (*Id.*)  She asked him whether PaRR should "factor in hourly wages and

fringe benefits in the per inspection rate."  (*Id.*)  Mr. Obert responded that, while the Service

Contract Act ("SCA")[9] would apply to independent contractors, "[t]here is nothing under SCA

that would prohibit your company from using its existing pay practices."  (*Id.* at ¶ 16.)  PaRR

took this advice into account in putting together its bid in response to FEMA's RFP.  (*Id.* at ¶ 17.)

---

[9]  The McNamara-O'Hara Service Contract Act of 1965, 41 U.S.C. §§ 351–58 (2008), requires contractors providing services to the Federal Government to pay workers no less than specified minimum amounts for specific classes of workers, as determined by the DOL.  FEMA, thus, required bidders to pay housing inspectors time-and-a-half the amount otherwise determined by the DOL.  (Ex. "M," Klause Decl., ¶ 19.)

### 2.     PaRR Obtained FEMA's Approval To Pay Independent Contractors A Per-Inspection Rate That Includes Overtime.

FEMA invited PaRR to enter into detailed negotiations as part of the procurement process.  (*Id.* at ¶ 18.)  At the same time, FEMA amended the RFP to require bids to conform to a DOL determination that $18.78 per-hour was the minimum compensation that FEMA disaster housing inspectors must be paid (the "DOL Determination").  (*Id.* at ¶ 19.)  PaRR submitted to FEMA, as part of its Final Revised Business proposal, a chart showing how its per-inspection rate had been structured to comply with the SCA and the DOL Determination.  (*Id.* at ¶ 20.)  The per-inspection rate would include payment for 40 hours of work at $18.78 per-hour, plus the monetary value of all health benefits and fringe benefits required by the SCA and established by the DOL Determination.  (*Id.* at ¶ 21.)  PaRR included, in addition, a subsistence payment of $770.00 per-week, even though this was not required by the SCA.  (*Id.*)  PaRR also *included overtime* in the per-inspection rate (and assumed that inspectors would work, on average, the equivalent of 30 hours of "overtime" in a week).  (*Id.* at ¶ 22; Ex. "C," Frost Dep. at p. 80.)

PaRR assumed that an inspector of average experience and ability could perform about 56 inspections in a week.  Since FEMA's specification for inspection work established that inspections take, on average, between thirty to forty-five minutes to complete,[10] PaRR concluded that fifty-six inspections could be completed in 28 to 42 hours by an average inspector.  (Ex. "M," Klause Decl., ¶ 23.)  PaRR recognized, however, that the actual number of inspections that any individual inspector elects to complete in a week is left up to the discretion of that inspector.  (*Id.* at ¶ 26.)  Furthermore, each inspector is entirely free to choose how many, or how few, inspections he or she chooses to complete in any one week.  (*Id.*)  Naturally, the more

---

[10]   Houston agreed that it took him an average of about thirty minutes to forty-five minutes to do a single inspection. (Ex. "B," Houston Dep. at p. 79.)

inspections that are completed, the more money an inspector can make.  Houston's testimony

confirmed these arrangements as to him.  (Ex. "B," Houston Dep. at pp. 79 & 139.)[11]

### 3. PaRR Has Never Been Informed That Paying Independent Contractors A Per-Inspection Rate Violates The FLSA.

No Government agency has ever suggested to PaRR that its payment practices might in

any way run afoul of, let alone violate, the FLSA, or any other federal wage or hour law.  (Ex.

"M," Klause Decl., ¶ 51.)  No official at the DOL's Wage and Hour Division has ever

contradicted Mr. Obert's initial advice to PaRR regarding the payment of a per-inspection rate to

Independent Contractors.  (*Id.* at ¶ 52.)  Similarly PaRR is unaware of any court decision, or

administrative decision issued by the DOL, that would require disaster housing inspectors to be

classified as employees, or which rules that it is not permissible to use Independent Contractors,

as opposed to employees.  (*Id.* at ¶ 53.)

### 4. PaRR Calculated Different Rates For Different Types Of Inspections Required By FEMA.

Last July, the Court wanted to find out whether there are "different levels" of inspections

and inspectors.  (Ex. "A," at p. 25.)  There are.  All inspections, just like all inspectors, are not

the same.  Different amounts are paid for different types of inspections.

The initial per-inspection rate for standard inspections under PaRR's first contract with

FEMA was $44.66.  (Ex. "M," Klause Decl., ¶ 24.)  FEMA requires a normal turnaround time

for a standard inspections of 72 hours.  (*Id.* at ¶ 33.)  Sometimes, however, FEMA requires an

inspection to be completed, as a "priority," within 24 hours.  (*Id.*)  For these "priority"

inspections, PaRR proposed to pay $66.99 per-inspection, 50% more than the standard rate.  (*Id.*)

---

[11]  Other high-performing Independent Contractors confirm that individual performance depends entirely upon how hard any inspector wishes to work, and that the choice of how hard to work is entirely up to each inspector.  (*See* Ex. "N," Bone Decl., ¶ 4; Ex. "O," Clark Decl., ¶ 14; Ex. "P," Elza Decl., ¶ 10; Ex. "Q," Graves Decl., ¶¶ 12, 15, 19; Ex. "R," Morgan Decl., ¶¶ 16, 17, 20; Ex. "S," Reilly Decl., ¶¶ 5, 10; Ex. "T," Stone Decl., ¶¶ 8, 11.)

In addition, inspections may occasionally have to be carried out beyond the immediate geographic confines of a designated disaster area. (*Id.* at ¶ 34.) This can require greater than normal travel, so the "remote" inspection can take longer to complete. (*Id.*) For these "remote" inspections, PaRR's proposed per-inspection rate was $66.99. This, too, was 50% higher than the standard inspection rate. (*Id.*)[12] Finally, PaRR proposed to pay $49.66 for each completed "Quality Control" inspection. (*Id.* at ¶ 36.) A "Quality Control" inspection is a re-inspection of another inspector's work, carried out by a highly experienced "QC" inspector (drawn from the top 1.8% of all PaRR inspectors from 2004 through 2007) to ensure that FEMA's exacting standards are being met. (*Id.* at ¶ 66.)[13]

PaRR informed FEMA of each of these differential rates in a chart showing the "Details of PaRR's Inspector Compensation Package." (*Id.* at ¶ 37.)

### 5.   PaRR's Contracts With FEMA Incorporate Its Payment Of A Per-Inspection Fee That Includes Overtime.

The "Details of PaRR's Inspector Compensation Package" were incorporated into the contract that FEMA first awarded to PaRR in February, 2001 (the "First FEMA Contract"). (*Id.* at ¶ 27-28.) FEMA awarded another contract to PaRR in March, 2007 ("Current FEMA Contract"). (*Id.* at ¶ 38.) Throughout PaRR's performance of the First FEMA Contract and the Current FEMA Contract, FEMA has required PaRR to continue to comply with all applicable DOL Determinations. (*Id.* at ¶ 39.) As the DOL issues periodic new Determinations for housing inspectors, PaRR has increased the amounts of its respective per-inspection rates accordingly. (*Id.* at ¶ 40.) In this way, PaRR has always paid each of its Independent Contractors a per-inspection fee that includes the minimum hourly rate prescribed by the DOL for housing

---

[12]   Throughout the period covered by the Complaint, Houston performed no "remote" inspections for PaRR. (Ex. "M"; Klause Decl., ¶ 35.)

[13]   Houston admits in his Memorandum that he was among this select group. (Plaintiffs' Mem. at p. 7.)

inspectors, that includes the monetary value of all prescribed fringe benefits, *and that includes overtime*. (*Id.* at ¶ 41.)

**6.      PaRR Has Informed Its Independent Contractors That The Terms Of Payment Include An Overtime Premium.**

PaRR maintains a secure website to which all of its Independent Contractors are given access. PaRR has explicitly informed *all* of its Independent Contractors, on this website, that the per-inspection rate included: (i) the equivalent of an hourly wage; (ii) the monetary value of fringe benefits; and (iii) *overtime*. (*Id.* at ¶ 30.) This policy is set out in PaRR Policy 001. Policy P001 has been available on PaRR's website since at least December 1, 2003. (*Id.*; Ex. "E.") It was, therefore, available to both Houston and every other PaRR Independent Contractor at all times material to this case. (Ex. "M," ¶ 30.)[14]

Accordingly, this is a peculiar case. As framed in the Complaint, Houston seeks conditional certification of a "PaRR Class" of inspectors who, he says, have been wrongfully "misclassified," and, as a result, have not been paid overtime. It is uncontroverted, however, that Houston has *already been paid overtime* for any hours in excess of 40 per-week that he spent doing disaster housing inspections for PaRR, and he admits this in his Memorandum. (Plaintiffs' Mem. at p. 7.)

**E.      Houston Was Never "Similarly Situated" To The Vast Majority of PaRR Independent Contractors That He Now Claims to Represent.**

**1.      Houston Was An Exceptionally Experienced Disaster Housing Inspector.**

Despite the criminal past that he intentionally concealed from PaRR, Houston was no ordinary inspector. He was a truly exceptional one. He was among the top 1.8% of PaRR's most seasoned and experienced disaster housing inspectors. (Ex. "B," Houston Dep. at p. 38; Ex. "C,"

---

[14]  Houston testified that he actually read what was on PaRR's website. (Ex. "B," Houston Dep. at p. 70.)

Frost Dep. at p. 127; Ex. "L," Sec. Supp. Decl. of PaRR, ¶ 8; Ex. "M," Klause Decl., ¶ 63.)  Even

before he signed his first ICA with PaRR, Houston had already worked as a FEMA housing

inspector for over seven years, and he had performed well over 13,000 inspections for three other

Government contracting firms, including Alltech.  (Ex. "L," Sec. Supp. Decl. of PaRR, ¶ 8; Ex.

"B," Houston Dep. at pp. 38-40.)  Very few, if any, of PaRR's other Independent Contractors had

the expansive store of knowledge and experience that Houston possessed.

### 2.  <u>Houston Paid No Income Tax On His 2004-2006 Earnings.</u>

Another fact distinguishes Houston uniquely from most other inspectors.  From 2003 to

July of 2006, Houston earned over $305,000 in income from PaRR.  (Ex. "B," Houston Dep. at

p. 58.)  Despite being one of PaRR's most highly compensated inspectors, Houston decided to

enhance his already substantial earnings in a unique fashion.  He decided not to file any income

tax returns, and not to pay any income taxes, in any of the years in which he performed services

for PaRR.  (*Id.* at pp. 22-23, 25 & 56-58.)[15]

### 3.  <u>Houston's Long Experience and High Level Of Skill Qualified Him to Perform "Quality Control" Inspections.</u>

From 2004 to 2007, only 1.8% of the Independent Contractors performing work for

PaRR were sufficiently highly qualified to be asked to perform "Quality Control" inspections.

(Ex. "C," Frost Dep. at pp. 127-28; Ex. "M," Klause Decl., ¶ 66.)  Based on his extensive

knowledge, experience and skill, Houston was one of this élite number of inspectors who were

---

[15]  Houston testified that, in 2007, he filed a belated income tax return for his 2005 earnings.  (Ex. "B," Houston Dep. at p. 22.)  He also testified, under oath, that he had filed a late 2004 tax return in 2007.  (Ex. "B," Houston Dep. at p. 22.)  As it turns out, however, Houston did *not* file a 2004 tax return at any time.  (*See* Exhibit "I," 10/22/08 E-Mail from Richard Kinnan, Esq.)  By contrast, other individuals providing housing inspections services to PaRR make deliberate financial and tax planning decisions based upon their status as Independent Contractors.  (*See* Ex. "N," Bone Decl., ¶ 7; Ex. "O," Clark Decl., ¶ 12; Ex. "P," Elza Decl., ¶ 21; Ex. "Q," Graves Decl., ¶¶ 19-21; Ex. "R," Morgan Decl., ¶¶ 23; Ex. "S," Reilly Decl., ¶ 3; Ex. "T," Stone Decl., ¶¶ 15, 16.)  In no sense could Houston, whose tax planning strategy consisted of not paying taxes at all, be considered as an adequate class representative for these law-abiding inspectors who dutifully paid their taxes and who carefully structured their business operations for maximum tax advantage.

sufficiently highly qualified to be asked by PaRR to perform "Quality Control" inspections.  (*Id.*)

This sets him significantly apart from the vast majority of PaRR inspectors.  (*Id.*)[16]

**4.      Houston Has Not Performed Any Work For PaRR For Over Two Years, And Has Not Been Available For Work For Almost As Long.**

Houston has performed *no* work for PaRR since July 23, 2006.  (Ex. "L," Sec. Supp.

Decl. of PaRR, ¶ 17; Ex. "M," Klause Decl., ¶ 67.)  He has notified PaRR that he is no longer

available to work because of a medical condition.  (Ex. "M," Klause Decl., ¶ 67.)  After that,

however, Houston held himself out as being a highly-qualified "FEMA disaster housing

inspector," and he has solicited work in that capacity from the City of Gardena, California.  (Ex.

"B," Houston Dep. at p. 35.)

**F.      Houston Cannot Show That PaRR "Willfully" Violated The FLSA.**

Houston has no evidence to support his bald and unelaborated allegation that PaRR has

"willfully" violated the FLSA by "knowingly" misclassifying him as an Independent Contractor,

as alleged in Paragraphs 47 and 48 of his Complaint.  His testimony on the issue could not be

clearer:

> Q:  . . . What evidence do you have that these three defendants knowingly misclassified you?
>
> A:  *I don't have any evidence*.
>
> Q:  None at all?
>
> A:  *None*.

(*Id.* at p. 84) (emphasis added.)

---

[16]  Before working for PaRR, Houston had also qualified to do "Quality Control" inspections as an Alltech Independent Contractor.  (Ex. "L," Sec. Supp. Decl. of PaRR, ¶ 8.)  It is also noteworthy that Houston has not produced Declarations from other similarly highly qualified inspectors who want to "opt in" to this case.  By contrast, PaRR has produced Declarations from other top performers stating that that they have no desire to be reclassified as "employees," or to join this action, in part, because of the adverse tax consequences that they might suffer.  (*See* Ex. "N," Bone Decl., ¶ 9; Ex. "O," Clark Decl., ¶ 9; Ex. "P," Elza Decl., ¶ 22; Ex. "Q," Graves Decl., ¶ 21; Ex. "R," Morgan Decl., ¶¶ 24-5; Ex. "S," Reilly Decl., ¶¶ 9, 12; Ex. "T," Stone Decl., ¶¶ 17, 18.).  For obvious reasons, Houston cannot represent the interest of these individuals.

G.     **Houston Cannot Prove That He Worked More Than Forty Hours In Any Week.**

When Houston entered into an ICA with PaRR, the ICA specifically required him to "maintain appropriate records documenting hours worked and rates paid per disaster or task order." (Ex. "M," Klause Decl., ¶ 49; Ex. "F" at p. 2.) Houston admitted at his deposition, however, that he did not keep, and does not have, *any* records of the hours that he worked as an Independent Contractor for PaRR. (Ex. "B," Houston Dep. at p. 69.) Houston also admitted that he has no documents that would show whether he worked more than 40 hours a week in any particular week. (*Id.* at p. 45.)[17] Houston testified that, at one time, he did have appointment sheets upon which he had noted the time scheduled to perform inspections. (*Id.* at p. 72.) Although he kept these records at a storage facility in Nevada, according to his deposition testimony, he claims to have lost them. (*Id.*) Houston would not, therefore, be in a situation similar to other Independent Contractors who have complied with the record-keeping requirements of their ICA, and who would be in a position to establish how many hours they worked in each week.[18]

H.     **Houston Cannot Claim to Represent the Interests of Anyone Who Currently Performs Services For PaRR Because He Has Not Worked for PaRR For Two-and-a-Half Years.**

As stated above, Houston has not worked for PaRR for two-and-a-half years. The last work that he performed was in July of 2006. His Complaint was filed nearly a year-and-a-half

---

[17] Houston filed his consent to become a member of a collective action on November 27, 2007. (Ex. "B," Houston Dep. at p. 110.) Houston wants to assert claims stretching back three years, but throughout the first week of that three-year period, Houston was not performing any services for PaRR in the field. Instead, he was gambling in various Las Vegas casinos. (*Id.* at p. 112.)

[18] Houston agreed that the number of hours any individual inspector works depends entirely on the number of inspections the individual chooses to complete. (Ex. "B," Houston Dep. at p. 182.) Indeed, Houston had no idea whether the large number of inspections he was able to complete in a week was fairly representative of others' efforts, and he admitted that he was just "speculating about the individual situation of other inspectors." (*Id.* at p. 181.)

later, on November 8, 2007.  This Complaint was the first complaint filed against any Government contractor providing emergency housing inspection services for FEMA in which FLSA-based overtime claims have been made.  (Ex. "L," Sec. Supp. Decl. of PaRR, ¶ 19.) Having received this Complaint, PaRR tightened up the record-keeping requirements of its ICA, and made other changes to the ICA.  (*Id.*)  The ICA under which inspectors now perform disaster inspection services for PaRR is quite different from the one that Houston signed with PaRR when he performed services during the years 2004, 2005 and 2006.  (*Id.*)

Furthermore, as noted above, FEMA re-competed its contract with PaRR, and a new contract was awarded in 2007.  (Ex. "M," Klause Decl., ¶ 38.)  Under this new contract, the different per-inspection payments have been changed, and the ICAs have also been changed. (Ex. "L," Sec. Supp. Decl. of PaRR, ¶ 19.)  Inspector compensation is not the same as it was under the ICA pursuant to which Houston operated when he was a PaRR inspector years ago. (*Id.*)  In no sense, therefore, could Houston be said to be "similarly situated" to the inspectors that have performed services since the Complaint in this case was filed over a year ago.

## ARGUMENT

Houston has made the same arguments that were aired in his papers, and before the Court, last July.  He relies on the low-threshold that applies to requests for "conditional" certification of an FLSA "collective" action.  In his Memorandum, for example, which is thin on factual support, and even thinner on legal support, Houston relies upon the "minimal showing" that is required in such cases.  (Plaintiffs' Mem. at p. 11.)  Houston also refers to this low threshold as "not onerous," "fairly lenient," and "not rigorous…."  (*Id.* at p. 16.)  Nonetheless, even Houston admits that it is his obligation to come forward with at least "some evidence" that he is "similarly situated" to those that he claims adequately to represent.  (*Id.*)  Houston's theory seems to be that it is enough for him to show that the title of "FEMA Disaster Housing

Inspector" was the same for all PaRR inspectors, and that the tasks that they were asked to perform were essentially the same.  The law, however, as explained in PaRR's memorandum six months ago, contradicts this position.  *Forney v. TTX Co.*, No. Civ. A. 05 C 6257 2006 WL 1030194, *3 (N.D. Ill. Apr. 17, 2006) ("Whether similarly situated employees exist depends on the employees' *actual qualifications* and day-to-day duties, *rather than their job descriptions*.") (emphasis added.)

Houston has not shown that he is "similarly situated" to any but a small number of the most highly seasoned and experienced Independent Contractors who were sufficiently qualified to be asked to do "Quality Control" inspections.  As a result of his extensive experience, Houston was able to complete far more inspections, and to do them much more quickly, than the vast majority of other inspectors.  The consequences of this for Houston were tangible:  he made significantly more money than 99% of all other PaRR Independent Contractors.  Houston can only show that he is "similarly situated" to those inspectors who, like him, comprise the top 1.8% of PaRR's Independent Contractors.  If any "collective" action conditional certification is to be made in this case, it should be limited to that élite group of inspectors with whom Houston has shown himself to be "similarly situated."

Houston has *no* factual evidence to suggest, let alone establish, any "willful" violation of the FLSA, and so, even if the Court were inclined to approve the issuance of a notice to a class of inspectors who are "similarly situated" to Houston, the notice should go out only to the top 1.8% of all PaRR inspectors who performed services within the *two years* before the Complaint was filed.  There is no basis to send out a 3-year notice because Houston has no evidence of any "willful" violation of the FLSA on PaRR's part.

Finally, Houston has no standing to assert the injunctive relief claims aired in Count II of the Complaint.  Nor does any other individual inspector.  Congress has given the exclusive responsibility for bringing such claims to the Secretary of Labor.

## I.   STANDARD OF REVIEW FOR CONDITIONAL CLASS CERTIFICATION.

PaRR and Dewberry incorporate the Standard of Review set out in the Brief filed last June. (*See* Ex. "K," pp. 6-11.)

## II.   HOUSTON HAS SHOWN THAT HE IS "SIMILARLY SITUATED" TO A CLASS OF HIGHLY SKILLED INDEPENDENT CONTRACTORS WITH LONG EXPERIENCE.

There is an admittedly low threshold applied by courts at the conditional certification stage of an FLSA "collective" action.[19]  *Choimbol v. Fairfield Resorts, Inc*., 475 F. Supp. 2d 557, 564 (E.D. Va. 2006) (holding that plaintiffs seeking conditional certification must make a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law").  By the same token, while a plaintiff's burden at this stage "is not onerous," it is also "not invisible."  *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1164 (D. Minn. 2007).  If this Court were inclined at this stage to certify, conditionally, a "collective" action, it should be one consisting of inspectors who were "similarly situated" to Houston.

Courts have noted the potential for abuse inherent in "collective actions under the FLSA.  *Holt v. Rite Aid Corp.,* 333 F. Supp. 2d 1265, 1270 (M.D. Ala. 2004).  This Court already noted

---

[19]  Although PaRR acknowledges this "low threshold" at this stage of the case, PaRR also notes that "misclassification" claims of the type being made in this case are particularly inappropriate for "collective action" certification because, as the Northern District of Illinois has specifically observed, "misclassification" claims inherently require courts to make a factually-intensive, individualized determination as to the nature of each claimant's alleged "employment" relationship.  *Pfaahler v. Consultants for Architects, Inc.*, No. 99 C 6700, 2000 WL 198888, at *2 (N.D. Ill. February 8, 2000).  "Many other courts . . . have declined to find potential class members similarly situated where liability depended on an individual determination of each employee's duties."  *Reich v. Homier Distributing Co., Inc*., 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005) (citing *Pfaahler*, 2000 WL 198888, at *2, and multiple other cases.)

that certification of a "collective" action is a serious step.  (*See* Ex. "A" at p. 25.)  It is vital to make sure that the class is defined properly, and that notice is not sent out indiscriminately to thousands of people who are not "similarly situated" to the putative class representative.

Houston has conceded that he is "totally different" from the many individuals described in Paragraph 25 of his Complaint who "have little or no prior inspection experience, and little or no disaster training experience."  (Ex. "B," Houston Dep. at p. 76.)  He admitted that he was "one of the most seasoned and experienced inspectors employed by PaRR . . . ."  (*Id.* at p. 38.)  As a result, he earned over $300,000 in the three-year period that he performed services for PaRR, including $118,765.81 in 2005 alone.  (*Id.* at pp. 56-8.)  This sets Houston significantly apart from the vast majority of the thousands of Independent Contractors retained by PaRR to provide FEMA disaster housing inspection services.  (Ex. "C," Frost Dep. at p. 127; Ex. "M," Klause Decl., ¶ 61.)  Houston's situation is dissimilar to the bulk of individuals described in Paragraph 25 of his Complaint, as he has expressly admitted.  This admission establishes that he cannot adequately represent their interests, and that the class he proposes is overbroad.

III.   **HOUSTON IS NOT "SIMILARLY SITUATED" TO ANYONE WHO WORKED MORE THAN TWO YEARS AGO BECAUSE HE CANNOT PROVE ANY "WILLFUL" VIOLATION OF THE FLSA.**

This Court should deny Houston's request to authorize issuance of a notice to *every* disaster housing inspector who performed services for PaRR "within three years of the date of said Order."  (Plaintiffs' Renewed Motion, p. 1.)  As an initial point, asking the Court to issue a notice that would have to be sent to every inspector who had performed services within three years "of the date of said Order" is inappropriate.  Courts examining this issue have decided, for reasons of administrative efficiency, to use the date of the filing of the *Complaint* as the trigger point for issuance of notices.  *See, e.g., Castillo v. P&R Enters., Inc.*, 517 F. Supp. 2d 440, 449 (D.D.C.) ("Because the date on which the notices will be distributed is uncertain, it makes

administrative sense to set a firm date for the notice period, and *three years prior to the filing of the Complaint . . . is an appropriate date.*") (emphasis added), *recon. denied*, 517 F. Supp. 2d 450 (D.D.C. 2007); *De Luna Guerrero v. North Carolina Growers Ass'n, Inc.*, 338 F. Supp. 2d 649, 666 (E.D.N.C. 2004) (defining class as individuals employed "at any time on or after the date falling three (3) years immediately preceding the *date on which this action was filed*.") (emphasis added); *Sobczak v. AWL Indust., Inc.*, 540 F. Supp. 2d 354, 364 (E.D.N.Y. 2007) (holding that "notice should go to current and former employees of defendants who were employed *within three years preceding*" the date on which the complaint was filed.) (emphasis added.)  The proposed "PaRR Class," as defined in the Complaint (Complaint, ¶ 15), is consistent with these authorities.  The relief requested in the Plaintiffs' Renewed Motion is not.

### A.   The Limitations Period For Violations Of The FLSA Is Two Years, Unless The Violation Was "Willful."

The limitations period for FLSA actions is two years.  *Anderson v. N. Roanoke Veterinary Clinic*, No. 96-0250-R, 1997 U.S. Dist. LEXIS 12690, *15 (W.D. Va. Aug. 1, 1997) (citing 29 U.S.C. § 255(a) (1994)).  Only if the plaintiff can establish a "willful" violation of the FLSA is this two-year limitations period extended to three years.  *Id.*  This is a high hurdle to clear, and findings of "willful" violations are rare.  A violation may be found to be "willful" only in unusual circumstances:  if an "employer either *knew or showed reckless disregard* for the matter of whether its conduct was prohibited by the statute . . . ."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (emphasis added.)  Houston has come nowhere close to clearing that hurdle.  He admits that he knows of *no* facts to support the bare-bones legal conclusions ventilated in Paragraphs 47 and 48 of his Complaint.

*McLaughlin* sets a high standard, and for good reason.  The Supreme Court has underscored the important distinction between "willful" violations and non-willful ones: "[t]he

- 21 -

fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw *a significant distinction between ordinary violations and willful violations." Id.* (Emphasis added.)  Thus, an FLSA plaintiff making a "willful" violation claim bears the demanding burden of establishing that the employer "either knew or showed reckless disregard for the matter whether [their] conduct was prohibited by the statute." *Truslow v. Spotsylvania County Sheriff*, 783 F. Supp. 274, 279 (E.D. Va. 1992) (quoting *McLaughlin*, 486 U.S. at 133.)

The Fourth Circuit has closely followed the standard articulated in *McLaughlin*, and noted that the Supreme Court has "*instruct[ed] us to look for an actually malignant—not merely careless—mental state*." *Chao v. Self Pride, Inc.*, 232 Fed. Appx. 280, 287 (4th Cir. 2007) (Unpublished) (citing *McLaughlin*, 486 U.S. at 133) (emphasis added).

One district court in this Circuit has distilled the post-*McLaughlin* cases into two categories: (1) those where there is evidence that the Defendant had previously been investigated for FLSA violations; and (2) those where there was evidence of a scheme by the employer to cover up FLSA violations.  *Williams v. Maryland Office Relocators*, 485 F. Supp. 2d. 616, 621 (D. Md. 2007).  Houston has admitted that he has absolutely no evidence to place the facts of this case into either one of those categories.  (Ex. "B," Houston Dep. at pp. 85, 86.)

**B.**      **Houston Has The Burden to Prove A "Willful" Violation Of The FLSA.**

Houston must show that PaRR and Dewberry "either knew or showed reckless disregard for the matter whether [their] conduct was prohibited by the statute." *Truslow*, 783 F. Supp. at 279 (quoting *McLaughlin*, 486 U.S. at 133).  He cannot simply rely upon the conclusory allegations in his Complaint and then waltz into court hoping, like Wilkins Micawber, that

"something will turn up."[20]   After *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955 (2007), litigants are not free to do this.   "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires *more than labels* and *conclusions*, and a *formulaic recitation of the elements of a cause of action* will not do."  *Id.* at 1964-65 (emphasis added.)  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.* at 1965. Houston is utterly unable to put *any* such factual allegations before the Court.

In view of *McLaughlin*'s exacting requirements, Courts have routinely declined to extend the two-year limitations period where the plaintiff "merely concluded that willfulness existed without pointing to any concrete evidence in the record."  *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311, 324 (S.D.N.Y. 2001); *accord Debejian v. Atlantic Testing Labs., Ltd*, 64 F. Supp. 2d 85 (N.D.N.Y. 1999) (applying the 2-year statute of limitations where the plaintiff offered no evidence that the defendant knew it was violating the FLSA); *Moore v. United Parcel Serv.*, No. 303-CV-1399L, 2004 WL 2339792, *13 (N.D. Tex. Oct. 15, 2004) (granting summary judgment to defendant on 2-year limitations period where the plaintiff offered "no other evidence of willful conduct other than this conclusory statement."), *aff'd*, 150 Fed. Appx. 315 (5th Cir. 2005).

This is precisely the predicament in which Houston finds himself.  He has admitted that he has *no* evidence that PaRR knowingly violated the FLSA.  His damning admission on this score repays repetition:

> Q:  . . . What evidence do you have that these three defendants knowingly misclassified you?
>
> A:  *I don't have any evidence*.
>
> Q:  None at all?
>
> A:  *None*.

---

[20]   Charles J.F. Dickens, *David Copperfield* (1852).

(Ex. "B," Houston Dep. at p. 84) (emphasis added.)  By his own admission, therefore, the unusual circumstances required to extend the FLSA's normal two-year limitations period to three years are not present in this case.

One fairly recent case from this Court illustrates the point.  It is the extraordinary case indeed where an alleged employer's conduct will be found to be so egregious as to meet *McLaughlin's* exacting requirement of "a deliberate scheme to evade the FLSA's overtime requirements, or at a minimum, reckless disregard for compliance with the statute." *Cubias v. Casa Furniture & Bedding LLC*, No. 1:06 cv 386, 2007 U.S. Dist. LEXIS 3380, *8 (E.D. Va. Jan. 14, 2007).  In *Cubias*, Judge Cacheris found that an owner of two furniture companies had engaged in a ham-handed and obvious effort to skirt the FLSA's overtime requirements by paying his employees from one company's account for all hours worked *under* 40 per week, and from another related company's account for all hours worked *over* 40 per week.  *Id.* at *2.  This is exactly the sort of egregious conduct that is required before the *McLaughlin* standard of "willfulness" will be satisfied.  Houston, however, has testified: "I don't have any evidence of that."  (Ex. "B," Houston Dep. at p. 85.)

Similarly, in *Martin v. Deiriggi*, 985 F.2d 129 (4th Cir. 1993), the Fourth Circuit found that *McLaughlin*'s elevated "willfulness" standard had been met, and affirmed the district court's application of the three-year limitations period, based on evidence that the employer had deliberately destroyed some records, and withheld others from the DOL, in an attempt to impede an investigation by the DOL.  *Id.* at 136.  Houston has admitted that he has no evidence of this sort of conduct by PaRR: "[I have] no evidence that PaRR has destroyed or withheld any records in order to block a DOL investigation of potential FLSA violations."  (Ex. "B.," Houston Dep. at p. 87.)  Other cases have found "willful" violations where the DOL had investigated past FLSA

infractions by the employer. *See, e.g., Reich v. Waldbaum*, 52 F.3d 35 (2d Cir. 1995).  Houston

had no idea whether the Wage and Hour Division of the Department of Labor has ever conducted

an investigation of PaRR.  (*Id.* at p. 86.)  In fact, no such investigation has ever been conducted.

(Ex. "M," Klause Decl., ¶ 51.)  Similarly, other courts have found a "willful" violation of the

FLSA when the DOL had notified the employer that its practices likely fell afoul of that Act, but

the employer did nothing in response.  *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th

Cir. 1991). Houston did not know whether any DOL representative has ever communicated to

PaRR that its conduct regarding Independent Contractors was not lawful.  (Ex. "B," Houston

Dep. at p. 86.)  In fact, no DOL representative has ever suggested to PaRR that retaining housing

inspectors as Independent Contractors creates any FLSA problems.  (Ex. "M," Klause Decl.,

¶ 52.)

### C.   Houston Has No Evidence of Any Violation Of The FLSA, "Willful" or Otherwise.

Courts have found that the *McLaughlin* standard is not met where the plaintiff "only

speculates that the Company willfully attempted to conceal plaintiff's eligibility for overtime pay

by hiring him as an independent contractor."  *See, e.g., Gustafson*, 171 F. Supp. 2d. at 323.

Houston has admitted that he has *no* evidence at all that PaRR willfully attempted to conceal his

eligibility for overtime pay by hiring him as an Independent Contractor.  (Ex. "B," Houston Dep.

at p. 85.)  The uncontradicted evidence in this case establishes that PaRR made deliberate and

conscientious efforts to ascertain—and to confirm—that its payments to Independent Contractors

would fully comply with the FLSA and SCA.  (Ex. "M," Klause Decl., ¶¶ 14-26.)  After that,

PaRR actually published, on its secure website, Policy 001 which informed all of PaRR's

Independent Contractors, Houston included, that the per-inspection rate paid to them included

overtime.  Houston has come forward with nothing, other than the ritual recitation in Paragraphs

47 and 48 of his Complaint that the violations of the FLSA on PaRR's part were "willful."  As

this Court instructed the Plaintiffs at the July 11 hearing, "class certification [is] a very serious

matter and it is done only when necessary."  (*See* Ex. "A" at p. 25.)  In light of Houston's detailed

and specific testimony that lays bare the complete lack of factual support for those allegations, it

would be an abuse of the "collective" action process to send notice to anyone who had done no

work for PaRR beyond the 2-year limitations period.[21]

### D.  The Undisputed Evidence In This Case Establishes That PaRR Has Not "Willfully" Violated The FLSA.

In the Memorandum accompanying his Motion, Houston characterizes this case as "a

'wage and hour' employment case . . . to collect overtime wages."  (Plaintiffs' Mem. at p. 11.)  It

is uncontroverted, however, that Houston has *already been paid overtime*.  Indeed, he admits this

in his Memorandum: "[t]he per inspection fee paid by PaRR to its inspectors *includes*

*compensation for anticipated overtime*, a 'fairly substantial amount of overtime.'"  (*Id.* at pp. 7,

10) (emphasis added.)

Before PaRR finalized its bid to FEMA, it was anxious to verify that it could comply

with all applicable federal wage and hour laws.  PaRR conferred with a senior wage and hour

analyst at the DOL.  He advised PaRR that nothing in the SCA prevented PaRR from retaining

housing inspectors as Independent Contractors.  In pre-contract discussions with FEMA, PaRR

was required to demonstrate that its payments to inspectors would comply with the wage and

benefit requirements of the SCA and the DOL Determination, and that its proposed per-

inspection fees included overtime.[22]  PaRR informed every inspector, including Houston, that the

---

[21]  PaRR and Dewberry thus object to the proposed Order submitted with the Plaintiffs' Renewed Motion, which proposes that notice be sent to all "inspectors employed by defendants over the past three (3) years."  Courts have warned of the potential for abuses that are inherent in the "collective" action process.  *Holt,* 333 F. Supp. 2d at 1270.

[22]  Alltech apparently did not include overtime in its payment rate or go through a similar process to demonstrate to FEMA that its payments to Independent Contractors included overtime.  (Ex. "D," Reynolds Dep. at pp. 38-39.)

per-inspection fee included the equivalent of an hourly wage, the monetary value of fringe

benefits, *and overtime*.  (Ex. "M," Klause Decl., ¶ 30.)  In this way, PaRR consciously and

deliberately attempted to assure that every Independent Contractor received full compensation

for any hours worked in excess of 40 in any week.  *See Anderson,* 1997 U.S. Dist. LEXIS 12690,

at *8 (finding that there could, by definition, be no "willful" violation of the FLSA where the

defendant had "attempted to comply with the FLSA by ostensibly paying the employees time and

a half for their hours over forty").  This is the antithesis of "willful" conduct on PaRR's part to

evade the FLSA.

> **E.    The Long-Standing Practice Of The Disaster Housing Inspection**
> **Industry To Retain Independent Contractors Establishes A**
> **Conclusive Presumption of PaRR's Good Faith.**

There is another, compelling, legal reason why there could not possibly be any "willful"

violation of the FLSA in this case.  In Section 530 of the Revenue Act of 1978, "Congress

provided that an individual whom the employer did not treat as an employee would be 'deemed

not to be an employee' for tax purposes 'unless the employer had no reasonable basis' for that

treatment of the individual."  *General Inv. Corp. v. United States*, 823 F.2d 337, 339 (9th Cir.

1987) (citing § 530(a)(1)(A) & (B) of the Revenue Act of 1978, 26 U.S.C. § 3401 note (1979)).

"Section 530(a)(2) provides that an employer's reasonable reliance on any of three supporting

elements constitutes a reasonable basis for not treating the an individual as an employee."  *Id.*

"The third provision . . . *creates a conclusive presumption* that an employer had a reasonable

basis for not treating an individual as an employee, if the employer did so in reasonable reliance

on '*long standing recognized practice of a significant segment of the industry* in which such

individual was engaged.'"  *Id.* at 339-40 (emphasis added.)  "Without question, Congress

intended to protect employers who exercised good faith in determining whether their workers

were employees or independent contractors."  *Id.* at 340.

The uncontradicted evidence in this case, developed after discovery conducted by both parties, is that the "long standing recognized practice of a significant segment of the industry" was to use Independent Contractors, not employees, to perform disaster inspections for FEMA and its predecessors.  (Ex. "M," Klause Decl., ¶ 6.)  This had been the uniform practice in the industry for twenty-five years before PaRR signed the First FEMA contract.  (*Id.*)  Houston is not aware of any facts to the contrary.  (Ex. "B," Houston Dep. at p. 88.)  Thus, the *undisputed* evidence in this case is that *every* company that has provided disaster housing inspection services to agencies of the Federal Government for the last quarter century has retained Independent Contractors, not employees, to perform those services.  (Ex. "M," Klause Decl., ¶ 6.)  PaRR's reasonable reliance on the long-standing practice of the entire disaster housing inspection establishes, therefore, a "conclusive presumption" that it acted in good faith, as established by the authorities cited above.  This dissolves completely any suggestion of any "willful" violation of the FLSA on PaRR's part.

Furthermore, this is the very first FLSA case that has ever been filed against Government contractors performing services for FEMA using Independent Contractors.  The pendency of this case has, understandably, had an impact upon the provisions of PaRR's current contracts with its inspectors.  (Ex. "L," Sec. Supp. Decl. of PaRR, ¶ 19.)  Their situation, therefore, is wholly dissimilar to the situation of people, like Houston, whose claims had accrued as of the time of the filing of the Complaint on November 8, 2007.  In line with the rationale of cases like *Castillo, De Luna Guerrero* and *Sobczak*, therefore, if the Court were inclined to authorize issuance of a notice in this case, it should only be sent to the top 1.8% of PaRR's most highly seasoned cadré of inspectors, who, like Houston, were sufficiently qualified to have been asked to do "Quality Control" inspections, in the *two years* before the date that the Complaint was filed.

IV.     **HOUSTON HAS NO STANDING TO ASSERT COUNT II OF THE COMPLAINT BECAUSE ONLY THE SECRETARY OF LABOR MAY PROSECUTE A CLAIM FOR INJUNCTIVE RELIEF.**

For two reasons, Houston lacks standing to request the prospective injunctive relief sought in Count II of his Complaint.  First, he has not worked for PaRR since July of 2006, so he is ill-positioned to represent the interests of people who have signed on as PaRR Independent Contractors since then, and who currently work for PaRR.  Second, the "right to bring an action for injunctive relief under the Fair Labor Standards Act rests *exclusively* with the United States Secretary of Labor." *Powell v. State of Florida*, 132 F.3d 677, 678 (11th Cir.) (emphasis added); *cert. denied*, 524 U.S. 916 (1998).  "Section 216(b) of the FLSA provides that an employee may bring an action against an employer for unpaid wages and liquidated damages." *Frazier v. Courter*, 958 F. Supp. 252, 254 (W.D. Va. 1997) (citing 29 U.S.C. § 216(b) (1994)).  "Section 217 provides that the district courts have jurisdiction to restrain violations of the FLSA, but section 211(a) provides that, except for cases involving child labor, 'the Secretary of Labor shall bring all actions under Section 217 of this title to restrain violations of this chapter.'" *Id.* (citing 29 U.S.C. § 211(a) & § 217 (1994)).  For this reason, "[t]he FLSA has been interpreted as precluding an employee's access to injunctive relief to enforce prospectively the provisions of the FLSA." *Id.*  Claims for injunctive relief like those advanced in Count II cannot, therefore, be pursued by individuals in a "collective" action.  They can only be pursued by the Secretary of Labor.

## CONCLUSION

Despite having conducted full discovery on the issue of whether he is "similarly situated" to any other person whose interests he now claims to represent, Houston has not shown that he is "similarly situated" to anyone other than those who are in the top 1.8% of inspectors who are so experienced that they have been asked by PaRR to perform "Quality Control"

inspections.  In addition, Houston has been conspicuously unable to excavate any facts to support his allegations of a "willful" violation of the FLSA by PaRR.  Even if the Court were inclined to authorize issuance of a notice to "similarly situated" persons, therefore, it should only go to the top 1.8% of PaRR's most experienced and skilled inspectors, like Houston, and it should only go to persons in that class who did work for PaRR during the two years before the date that the Complaint was filed.  Finally, in light of Sections 211(a) and 217 of the FLSA, the Court should decline to certify any class that requests the injunctive relief sought in Count II, because such claims can only be brought by the Secretary of Labor.

Respectfully submitted,

PARTNERSHIP FOR RESPONSE AND
RECOVERY
DEWBERRY & DAVIS LLC


By:_____/s/_____
                        Counsel

Stephen M. Sayers (VSB No. 23066)
Thomas P. Murphy (VSB No. 30765)
Michael E. Kinney (VSB No. 65056)
*Counsel for the Defendants,*
*Partnership for Response and Recovery and Dewberry & Davis LLC*
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
Telephone:  (703) 714-7400
Facsimile:  (703) 714-7410
ssayers@hunton.com
tpmurphy@hunton.com
mkinney@hunton.com

        - and -

James P. Naughton (VSB No. 25923)
*Counsel for the Defendants,*
*Partnership for Response and Recovery and Dewberry & Davis LLC*
HUNTON & WILLIAMS LLP
500 E. Main Street, Suite 1000
Norfolk, Virginia  23510
Telephone:  (757) 640-5300
Facsimile:  (757) 625-7720
jnaughton@hunton.com

## CERTIFICATE OF SERVICE

I certify that on the 21st day of November, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Gary B. Mims (VSB No. 19184)
Steven M. Frei (VSB No. 32211)
Gobind S. Sethi (VSB No. 72266)
*Local Counsel for the Plaintiffs,*
*Ronald E. Houston and Joseph Lomascolo*
HALL, SICKELS, FREI & MIMS, P.C.
12120 Sunset Hills Road, Suite 150
Reston, Virginia  20190
Telephone:  (703) 925-0500
Facsimile:  (703) 925-0501
gary.mims@hallandsickels.com
steve.frei@hallandsickels.com
gobind.sethi@hallandsickels.com

- and -

Teresa Burke Wright (VSB No. 30770)
Kara M. Ariail (VSB No. 46817)
Andrew S. Cabana (VSB No. 48151)
*Local Counsel for the Defendants,*
*Parsons Brinckerhoff Inc., and Alltech, Inc.*
JACKSON LEWIS LLP
10701 Parkridge Boulevard, Suite 300
Reston, Virginia  22182
Telephone: (703) 483-8300
Facsimile: (703) 483-8301
WrightT@jacksonlewis.com
AriailK@jacksonlewis.com
CabanaA@jacksonlewis.com

And I hereby certify that I will send the foregoing by U.S. Mail to the following non-filing users:

Walter K. Lack (admitted *pro hac vice*)
Richard P. Kinnan (admitted *pro hac vice*)
Paul Allan Traina (admitted *pro hac vice*)
*Counsel for the Plaintiffs,*
*Ronald E. Houston and Joseph Lomascolo*
ENGSTROM LIPSCOMB & LACK
10100 Santa Monica Boulevard, 12th Floor
Los Angeles, California  90067-4107
Telephone:  (310) 552-3800
Facsimile:  (310) 552-9434

    - and -

Karl A. Gerber (admitted *pro hac vice*)
*Counsel for the Plaintiffs,*
*Ronald E. Houston and Joseph Lomascolo*
EMPLOYMENT LAWYER'S GROUP
13418 Ventura Boulevard
Sherman Oaks, California  91423
Telephone:  (818) 783-7300
Facsimile:  (818) 995-7159

    - and -

Paul J. Siegel (admitted *pro hac vice*)
Wendy J. Mellk (admitted *pro hac vice*)
*Counsel for the Defendants,*
*Parsons Brinckerhoff Inc., and Alltech, Inc.*
JACKSON LEWIS LLP
58 South Service Road, Suite 410
Melville, New York 11747
Telephone:  (631) 247-0404
Facsimile:  (631) 247-0417

                           /s/
                      Michael E. Kinney (VSB No. 65056)
                      *Counsel for the Defendants,*
                      *Partnership for Response and Recovery and*
                      *Dewberry & Davis LLC*
                      HUNTON & WILLIAMS LLP
                      1751 Pinnacle Drive, Suite 1700
                      McLean, Virginia 22102
                      Telephone:  (703) 714-7400
                      Facsimile:  (703) 714-7410
                      mkinney@hunton.com