IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| RONALD HOUSTON, on behalf of himself and all others similarly situated, and JOSEPH LOMASCOLO, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 1:08cv0203 (LO/JFA) |
| URS CORPORATION, et al., | ) ) ) | |
| Defendants. | ) ) | |

**<u>DECLARATION OF RONALD P. KLAUSE</u>**

I, Ronald P. Klause, declare that the following facts are true to the best of my belief:

1.      I am a Professional Engineer by training.  I am currently employed by Dewberry & Davis LLC ("Dewberry").  My title is Consultant for Federal Programs.  From February of 2001 until April of 2008, I served as the Deputy Project Director for the Partnership for Response and Recovery ("PaRR").  In this capacity, I reported to Douglas D. Frost ("Mr. Frost"), PaRR's Project Director.  I assisted Mr. Frost in the management and oversight of PaRR's performance of its contract with the Federal Emergency Management Agency ("FEMA") of the United States Government.  Before becoming a Consultant to PaRR, I held the position of Deputy Project Director for over 8 years.  Before that, I was a Team Leader in Dewberry's Disaster Services Department.

2.      As PaRR's Deputy Project Director, I was PaRR's primary day-to-day contact with FEMA's Contracting Officer's Technical Representative.  I was responsible for the management of activities associated with PaRR's performance of disaster housing inspection

services under its contracts with FEMA from the beginning of PaRR's dealings with FEMA in 2000-01.

3.      One of the things I have been asked to address is Mr. Houston's contention that PaRR "knowingly" misclassified its inspectors as independent contractors rather than employees, as alleged in Paragraphs 47 and 48 of the Complaint that he has filed in this case.  I am able to do so because I personally participated in the development, preparation and submission of PaRR's bid to FEMA response to a Request for Proposals ("RFP") issued by FEMA.  The allegations of a "willful" violation of the Fair Labor Standards Act ("FLSA") are wholly without foundation because, during the bidding process, PaRR was required to demonstrate to FEMA how its per-inspection rate complied with applicable federal wage and hour laws and regulations.  In doing so, PaRR checked with the Department of Labor ("DOL") to verify that its proposal to use Independent Contractors would not run afoul of any federal labor laws, and then demonstrated to FEMA that its per-inspection rate actually *includes a component for overtime*.  I am at a loss, therefore, to understand how Mr. Houston can theorize that PaRR has violated the FLSA in any way, let alone "willfully."

4.      To the extent that Mr. Houston did any inspection work as a PaRR Independent Contractor from November 8, 2004 to November 8, 2007 (the date that his Complaint was filed), and to the extent that he did more than 40 hours of work in any week during that period, he has *already* been paid the proper amount of any overtime compensation that would be due to him even if he were a PaRR employee, which he was not.

## A.    PaRR

5.      PaRR was formed in 2000, and first won its first contract to provide disaster housing inspection services to FEMA in February, 2001.

6.     I was a member of the team that developed PaRR's business proposal.  We made the decision to retain Independent Contractors to provide disaster housing inspection services for FEMA.  This had been the business practice in the disaster housing inspection industry for at least twenty-five years before PaRR decided to submit a bid to FEMA.  Prior to 2001, several other companies had provided disaster housing inspections services to agencies of the Federal Government, including FEMA.  Those companies – Vulcan Services, Inc., Scientific Services, Inc., Suncoast Associates and Computer Science Corporation – had all retained inspectors as Independent Contractors to provide disaster inspection services under their contracts with FEMA or its predecessors.  None of these companies used employees to do the high-volume, time-sensitive inspections that FEMA required.

**B.**     **FEMA's Request for Proposals**

7.     In early 2000, FEMA issued a Request for Proposals, identified as Request # EMW-2000-RO-0018 ("the RFP").  The RFP sought bids from qualified firms to provide disaster housing inspection services in areas declared by the President of the United States to be the scene of national disasters.

**a.**     **Specifications of the RFP.**

8.     The disaster housing inspection services to be provided under the RFP were an integral part of the Housing Program that FEMA administers in accordance with the Disaster Relief and Emergency Assistance Act, as amended by the Robert T. Stafford Act.  The Housing Program provides emergency funds to homeowners and renters whose houses or residences have been damaged or destroyed as a result of a disaster, and who have inadequate or no insurance coverage.

9.     As part of the Federal Government's response to terrorist acts and natural events declared by the President to be national "disasters," inspections of damaged or destroyed

residences must be performed to determine whether an owner or renter is entitled to receive aid. Typically, due to the scale of natural disasters, there are thousands of inspections that must be done. With huge natural disasters, such as Hurricane Katrina, there may be tens of thousands, or even hundreds of thousands, of housing inspections that need to be done.

10.     During each inspection, a disaster housing inspector must, based upon his or her individual knowledge and experience, assess the damage done to an applicant's residence. Using a FEMA-issued hand-held computer, inspectors must record various data that FEMA requires in order to be able to evaluate applications for housing aid. Each inspector then downloads this inspection data directly to FEMA. Based upon the information that inspectors obtain during physical home inspections, and interviews with the applicant, FEMA then determines the type and amount of financial assistance for which the applicant may be eligible.

11.     FEMA cannot determine the type and amount of financial assistance without a detailed inspection of the applicant's home or residence. The work that housing inspectors do is, thus, vitally important to the Country. It is critical to FEMA's disaster response to get these housing inspections done quickly and thoroughly. People who have been through a disaster are at their most vulnerable and most needy. Often, their houses and possessions have been destroyed completely, or, at a minimum, badly damaged. Their situation cries out for immediate financial aid, and it is vital to get it to them quickly.

12.     Accordingly, PaRR was aware that it would have to try to recruit inspectors who have construction or real estate related backgrounds. Many such well-qualified people would already have jobs of their own or would own their own businesses. Each such person inevitably brings to the task of disaster housing inspections his or her widely variable sets of skills, experiences and abilities. In fact, it is possible for two different inspectors to inspect the same

residence, record different data and submit different final inspection reports, each of which would meet FEMA's acceptance criteria.  Given the almost infinite variation in the types of damage that can be caused to structures as the result of different types of natural disasters, the most important tool for the disaster housing inspector's job is his or her own independent judgment and experience.

      **b.**    **FEMA Amended the RFP to Require Compliance with Wage and Hour Laws.**

      13.    Before the submission of final proposals, FEMA issued several amendments to the RFP.  One was Amendment A004, issued on May 15, 2000.  Amendment A004 required bidders to show how they proposed to comply with the requirements of the Service Contract Act ("SCA"), and with U.S. Department of Labor ("DOL") requirements.  To that end, Amendment A004 imposed the following requirements upon each prospective bidder:

> For proposal preparation purposes, *Inspectors shall earn no less than the minimum hourly wage of $20.00 PLUS fringes and overtime (time and a half), as applicable*.  This minimum amount shall apply to all inspectors, whether contractor employees, subcontractors or consultants.  *This does not preclude payment of Inspectors on a per inspection basis*.  Travel expenses shall be in addition to wages.

(Emphasis added.)

      **c.**    **PaRR consulted with the Department of Labor to assure compliance with wage and hour laws.**

      14.    During the process of preparing its bid to FEMA, PaRR made specific inquiries of FEMA concerning PaRR's plans to use Independent Contractors to perform the time-sensitive inspections that FEMA required in very high volume.  FEMA suggested that PaRR should contact Thomas Obert, a senior wage and hour analyst at the DOL.  PaRR's Contracts Manager, Denice Bracey, did so.  Ms. Bracey informed Mr. Obert that:

> Our company intends to utilize independent Housing Inspector contractors and do not intend to hire them as employees.  We also intend to pay a per inspection rate rather than an hourly rate.  *This approach is common in the industry*.  We will issue contracts for the inspection services to each of the independent inspectors prior to sending them to a disaster site, and will pay for travel expenses.…  Each contracted Inspector gets a flat per inspection rate.

(*See* Exhibit No. 1) (emphasis added.)  Ms. Bracey requested the DOL's guidance on the issue of whether PaRR should "factor in hourly wages and fringe benefits in the per inspection rate for each contract inspector."

15.     As illustrated in Paragraph 6 above, Ms. Bracey's statement, about the industry's historic use of Independent Contractors as being "common," was entirely correct.

16.     Mr. Obert advised Ms. Bracey that the "SCA would apply to any contractor performing such services," whether or not he or she was an Independent Contractor.  (*See* Exhibit No. 1.)  Mr. Obert also explained that "[t]here is nothing under SCA that would prohibit your company from using its existing pay practices.  However, for SCA compliance purposes, you would need to show that for each hour worked on a covered SCA contract that the inspectors receive at least the minimum monetary wage rate and fringe benefit (which are separate and distinct requirements) set forth in the applicable wage determination."

17.     PaRR took Mr. Obert's advice into account in preparing its bid to FEMA.

**d.     FEMA amended the RFP to incorporate specific DOL Determination for Housing Inspectors.**

18.     On July 31, 2007, FEMA informed PaRR that its bid fell within the competitive range.  FEMA then invited PaRR to enter into detailed negotiations with FEMA as part of the continuing procurement process.

19.     On the same date, FEMA again amended the RFP, this time to incorporate the DOL's determination of the minimum compensation that would have to be paid to FEMA

disaster housing inspectors (the "DOL Determination").  The DOL Determination established

that minimum compensation of $18.78 per-hour would have to be paid to housing inspectors.

The DOL Determination it also specified the monetary value of certain fringe benefits that would

also have to be paid.  The DOL Determination replaced the $20.00 per-hour rate that had been

set by Amendment A004 for the proposal preparation purposes.  FEMA thus required PaRR to

pay its Independent Contractors time-and-a-half, as applicable, the rate specifically established

by the DOL.

     **e.**     **PaRR demonstrated to FEMA that its Business Proposal complied with the SCA and DOL Determination before FEMA awarded the Contract.**

     20.     PaRR was then asked by FEMA to demonstrate that its proposed inspector

compensation plan complied with both the SCA and with the DOL Determination.  Accordingly,

PaRR submitted, along with its Final Revised Business Proposal, a chart showing how it had

calculated the amount of the per-inspection fee to be paid to inspectors (the "DOL and SCA

Compliance Details Chart").  (*See* Exhibit No. 2.)

     21.     First, PaRR broke out separately the weekly amount of the minimum

compensation rate for housing inspectors, and the monetary values of the health benefits and

fringe benefits that were required by the SCA (and by the DOL Determination for housing

inspectors).  Supplementing these amounts, PaRR also included a subsistence payment, even

though this is not actually required by the SCA.  The amount of this subsistence payment was

$770.00 per-week.

     22.     Second, in view of the time pressures and high volume required by FEMA,

PaRR's model presumed a 70-hour workweek, and the per-inspection rate, therefore, included

payment for 30 hours of overtime in the amount of $845.10 per-week.  This overtime rate was

calculated as 150% of the basic rate.  In this way, the per-inspection fee automatically included an amount for overtime.

23.     PaRR then aggregated the total of these various amounts into a single per-inspection rate that it proposed to pay inspectors if it were awarded the contract.  PaRR assumed that inspectors would be able to complete an average of eight inspections per-day in a seven-day week, or a total of fifty-six inspections per-week.  This assumption was based on FEMA's specification in the RFP that inspections should take, on average, between thirty and forty-five minutes to complete.  To perform fifty-six inspections in one week, therefore, an inspector would have to work between 28 and 42 hours.

24.     The 2001 per-inspection rate of $44.66 for normal inspections resulted from dividing the sum of the minimum compensation rate (and monetary value of fringe benefits) prescribed by the DOL Determination, *plus the overtime component* and subsistence payments, by fifty-six inspections.  Since FEMA's technical specifications for inspections indicated that inspections should take no more than thirty to forty-five minutes, this per-inspection rate surpassed the minimum compensation rate prescribed by the DOL Determination by a considerable margin.  In addition, it resulted in a significantly higher per-inspection rate than had ever been offered to disaster housing inspectors before.

25.     Paying a per-inspection rate that was a lot higher than the compensation rate required by the DOL Determination served two general goals for PaRR.  First, as PaRR had informed FEMA in pre-contract discussions, it was committed to treating inspectors who agreed to perform emergency housing inspections for FEMA fairly.  Second, in order to comply with FEMA's performance requirements, PaRR needed to provide an effective financial incentive to inspectors to perform as many inspections as possible in the shortest amount of time, while still

meeting FEMA's rigorous quality control requirements, and satisfying the requirements of the SCA and the DOL Determination.

26.     The actual number of inspections that any individual inspector elects to complete, however, is left entirely to the discretion of each individual inspector.  Similarly, the actual number of inspections that any individual inspector is able to complete depends entirely upon each inspector's ability to manage his or her workload.  In every case, however, *every* inspector would receive payment for overtime within the per-inspection fee for each inspection that he or she completed, whether or not the inspector actually worked more than 40 hours in any week.  If the inspector worked fewer than 40 hours in a week, the inspector would have been overpaid, in a sense.  If the inspector worked more than 40 hours in a week, PaRR's per-inspection rate included overtime.  In order to complete as many inspections as quickly as possible, PaRR believed that it had to provide a *significant* monetary incentive to the inspectors who agreed to perform the work.  That is why PaRR pays inspectors so much more than it is required to under the SCA or under the DOL Determination.

**C.     PaRR is Awarded the First FEMA Contract**

27.     FEMA accepted PaRR's bid, and it awarded PaRR one of two contracts (the "First FEMA Contract").  PaRR and FEMA entered into the First FEMA Contract on February 14, 2001.  FEMA awarded the other contract to ALLTECH, Inc. ("ALLTECH").

28.     As FEMA had requested, the "Details of PaRR's Inspector Compensation Package" were incorporated into the Statement of Work of the First FEMA Contract.  (*See* Exhibit No. 3.)

29.     PaRR performed the First FEMA Contract for six years.  Throughout that time, FEMA never once suggested to PaRR that its per-inspection fee structure might not comply with the SCA, the DOL Determination, the FLSA, or any other requirement of federal law.

**D.**   **All of PaRR's Independent Contractors Were Expressly Informed that the Per-Inspection Rate Included Overtime**

30.     After it had been awarded the First FEMA Contract, PaRR expressly informed all of its Independent Contractors that the per-inspection fee paid to them included the equivalent of an hourly wage, the monetary value of fringe benefits, *and overtime*.  PaRR's Policy P001, which outlines these payment details, was included in PaRR's Disaster Housing Inspector Manual and has been available to all inspectors on PaRR's website since at least December 1, 2003.  An accurate copy of Policy P001 was identified as Exhibit 17 to the October 3, 2008 deposition of Ronald E. Houston.  It was available to Mr. Houston, and to every other PaRR Independent Contractor, on PaRR's website, at all times material to this case.

**E.**   **No "Willful" Violation of the FLSA**

31.     Accordingly, the facts establish that PaRR did not "willfully" violate the FLSA as alleged in Paragraphs 47 and 48 of Mr. Houston's Complaint.  To the contrary, PaRR paid a per-inspection rate that greatly exceeded the hourly rate that the DOL had determined should be paid to housing inspectors, *and it also built an overtime component into that rate*, calculated at time-and-a-half.  PaRR consulted with the DOL specifically to determine whether retaining inspectors as Independent Contractors would comply with federal labor laws, and PaRR included payment for overtime in the per-inspection fee based on the DOL Determination for housing inspectors.  There has been no violation, therefore, of the FLSA, let alone a "willful" one.  To illustrate this point, even if Mr. Houston had been classified as an employee, as he claims he should have been, he has *already received full overtime compensation* for any hours he worked in excess of 40 in any week that he elected to work, because that overtime was already built into the per-inspection fees paid to him.

F.    **PaRR Pays Higher Per-Inspection Rates for Different Types of Inspections**

32.    PaRR pays different amounts for different types of inspections and related work.

    1.    **"Priority" Inspections**

33.    In 2001, PaRR paid its inspectors $66.99 to do "priority" inspections.  A "priority" inspection is one that FEMA requires to be completed within 24 hours, instead of 72 hours as required for standard inspections.  This would require an inspector to adjust his or her schedule to accommodate the accelerated turnaround time.  The higher rate for "priority" inspections is designed to ensure that an inspector is fairly compensated for doing so.

    2.    **"Remote" Inspections**

34.    PaRR also proposed to pay $66.99 for "remote" inspections in 2001, because of the additional time such inspections might take.  A "remote" inspection is one that FEMA designates as such outside the general disaster area, and which requires an inspector to do an unusual amount of travel.  The higher rate for "remote" inspections is designed to ensure that an inspector who has to travel greater than normal distances is fairly compensated for doing so.

35.    Mr. Houston did not perform any "remote" inspections from November 8, 2004 to July 23, 2006, which was the last date that he did any inspections for PaRR.

    3.    **"Quality Control" Inspections**

36.    For "Quality Control" inspections, PaRR proposed to pay that rate of $49.66 per-inspection in 2001.  "Quality Control" inspections are follow-up inspections conducted on a certain percentage of the normal inspections that have been completed by other inspectors.  This is done to fulfill the quality control standards required by FEMA.

37.    PaRR set out these different inspection rates in a chart showing the "Details of PaRR's Inspector Compensation Package," which was submitted to FEMA with PaRR's 2001 bid.  (*See* Exhibit No. 3.)

**G.**    **The Current FEMA Contract**

38.    PaRR competed for and won another contract to provide disaster housing inspection services in 2007 ("the Current FEMA Contract").  The Current FEMA Contract was signed on March 30, 2007.

**H.**    **PaRR Continues to Comply with DOL Determinations for Housing Inspectors**

39.    Throughout the performance of its contracts with FEMA, PaRR has been required to comply with the applicable DOL Determinations.  PaRR has done so, and it continues to do so.

40.    Any time that the DOL issues a new Determination applicable to housing inspectors, PaRR revises its per-inspection fee accordingly.  The DOL Determination for housing inspectors applicable to the Current FEMA Contract prescribes a minimum compensation rate of $18.78 per-hour, plus fringe benefits or their monetary equivalent.  PaRR has, accordingly, raised its per-inspection payments to stay within this DOL guideline.

41.    In compliance with the current DOL Determination applicable to housing inspectors and the FLSA, PaRR pays each of its Independent Contractors a per-inspection fee that includes: (1) the prescribed minimum wage rate; (2) the monetary value of fringe benefits; and (3) *a required overtime payment*.  Currently, the per-inspection fee is $50.00.

**I.**    **PaRR's Contractual Relationships with Housing Inspectors**

42.    PaRR enters into an Independent Contractor Agreement ("ICA") with each inspector who agrees to perform disaster inspection services under PaRR's contracts with FEMA.  Merely signing the ICA, however, is no guarantee that an Independent Contractor will get any work.  As stated above, disasters are inherently unpredictable.  Inspectors may get no housing inspection work at all in a year, or they may get a lot.  This work is performed on an "as needed" basis and the vast majority of PaRR's inspectors are otherwise employed with other

companies or support themselves with other work and may not be available when a particular disaster strikes.

43.     When PaRR receives notice of a disaster declaration, or the possibility of a disaster declaration, it identifies inspectors who have informed PaRR of their general availability.  PaRR then begins to contact those inspectors to see whether they are willing to make themselves available for a specific deployment.  Some are willing.  Some are not.  To illustrate this, when the President of the United States recently declared the New Orleans area a natural disaster after Hurricane Gustav hit the New Orleans Coast, PaRR had hoped for a response of 80% to 85% of the inspectors that it contacted.  Only about 30% of the people contacted chose to deploy to Texas.

44.     Each inspector is, therefore, entirely free to accept or to decline PaRR's request, depending upon their individual circumstances at the time.

45.     Once inspectors are deployed, they are entirely free to set their own schedule, and they can choose when they work, and how long they want to work, on any particular day.  PaRR has no control over this.

46.     PaRR does not tell inspectors when to begin their work day, when to take breaks or when to end their workday (other than passing along FEMA's common sense requirement that disaster victims should generally not be bothered with telephone calls after 10:00 p.m.).  The inspectors are free to make their own work arrangements.  They choose when to begin, and when to stop.  PaRR has no ability to tell its Independent Contractors when to start or when to stop.  Once they get inspections assigned to them, each inspector is free to choose when, and how, to go about getting the inspections done.  PaRR has no involvement in that choice.  Indeed, if an inspector chooses not to work at all on a particular day, then he or she is completely free to do

so.  Similarly, an Independent Contractor can work as much, or as little, as he or she wishes.

Consequently, PaRR does not, and cannot, control the manner in which the Independent

Contractors perform their housing inspection activities.

47.     The ICA that PaRR enters into with each inspector does not contain a covenant

not to compete.  Each Independent Contractor is free to work for whichever company he or she

wishes to work for, including ALLTECH, PaRR's main competitor.  Additionally, inspectors

may be engaged in any other lawful business or profession while they are under contract to

PaRR.

48.     Under the ICA, when an Independent Contractor agrees to accept inspection work

at a particular disaster location, PaRR agrees to reimburse the Independent Contractor for his or

her travel expenses to and from that location.  The Independent Contractors bear all other

expenses, including local transportation, lodging, meals and any other expense that he or she

incurs.  Many inspectors have a variety of ways to minimize their expenses during a deployment,

thus maximizing their profits.  For example, some inspectors use their own mobile homes, and

thus avoid having to pay hotel expenses altogether.

49.     When Houston performed services for Parr, the ICA that he signed required each

inspector to "maintain appropriate records documenting hours worked and rates paid per disaster

or task order."  The ICA that PaRR has entered into with inspectors since "[t]he Independent

Contractor specifically agrees to keep accurate records of all time spent in completing the

inspections claimed on all invoices submitted for payment and performing all other duties under

this agreement."

50.     PaRR does not withhold any state or federal income tax from the payments to its

Independent Contractors.  PaRR does not issue IRS W-2 Forms to its Independent Contractors.

Instead, each inspector submits an IRS Form W-9 to PaRR, and PaRR reports the payments it has made to the Independent Contractors, as "nonemployee compensation," by Form 1099 to the Internal Revenue Service.  An Independent Contractor may request to be paid directly or through a corporate or other business entity, and many do.

**J.      Parr Has Never Been Informed That Using Inspectors As Independent Contractors Allegedly Fails to Comply with the Requirements of the FLSA**

51.      PaRR has never been investigated for any alleged violation of the FLSA to its knowledge.  Similarly, no Governmental agency, including the Internal Revenue Service and the DOL, has ever informed PaRR that its practice of using Independent Contractors to perform housing inspections for FEMA, or its payments to Independent Contractors, in any way infringes the requirements of the FLSA, or any other wage and hour law or regulation.

52.      PaRR has never received any indication from any responsible official of the DOL's Wage & Hour Division that its use of Independent Contractors, or its payments to them, run afoul of any applicable federal law or regulation.

53.      PaRR is not aware of any federal or state court decision holding that FEMA disaster housing inspectors are automatically to be considered employees, and not Independent Contractors.  Nor is PaRR aware of any Administrative Letter issued by the Wage & Hour Division of the DOL finding that disaster housing inspectors must be classified as employees, and not independent contractors.

**K.      Mr. Houston Is Not a Typical PaRR Independent Contractor**

**a.      Mr. Houston is ineligible to perform disaster housing inspections for FEMA because of his criminal background.**

54.      Individuals who have been convicted of a felony, or who have other significant criminal activity in their backgrounds, are not eligible to perform disaster housing inspections on behalf of FEMA.  FEMA, thus, requires everyone who wishes to perform disaster housing

inspections to undergo periodic background checks as a condition of doing such work.  In addition, during the time of Mr. Houston's engagement, when PaRR issued a Task Order to Independent Contractors for deployment to a specific disaster, it asked each of them to certify that they had not been arrested for, charged with or convicted of any felony charge as of the date of the Task Order.

55.     An accurate and authentic copy of the first Task Order that Mr. Houston signed, dated January 6, 2002, is attached as Exhibit No. 2 to the Second Supplemental Declaration of Partnership for Response and Recovery.  On this Task order, Mr. Houston certified that he had never been convicted of any felony charge when that was not correct.  In March of 2002, Mr. Houston completed, and electronically submitted to PaRR, a Consultant Application, in which he falsely stated that he had never been convicted of a felony, as detailed in Paragraph 3 of the Second Supplemental Declaration of PaRR.

56.     Mr. Houston has signed many other Task Orders containing this certification. Each time he did so, as it turns out, Mr. Houston misrepresented his criminal background to PaRR.

57.     PaRR would never have retained Mr. Houston as an Independent Contractor if he had told PaRR the truth about his criminal background.  When PaRR initially entered into an ICA with Mr. Houston, it was not aware of his criminal background in the State of California, as is explained in Paragraph 3 of the Second Supplemental Declaration of PaRR signed by Mr. Frost.  Furthermore, in every Task Order that he signed, Mr. Houston misrepresented his criminal background to PaRR.  PaRR did not learn of Mr. Houston's criminal record in California until after he filed his Complaint in this case.

58.     I have read Mr. Houston's deposition, in which he admitted on Pages 14 to 16 that he had, in fact, been arrested for, charged with *and convicted* of, various offenses, including a felony conviction for possession of cocaine base with intent to distribute, as well as use of force against a law enforcement officer, and other gun-related and violent crimes.  This was after he denied ever having a criminal record, on Page 9 of his deposition.  He later contradicted this, and testified, on Page 17 of his Deposition, that he had served a jail sentence, after being convicted by a jury on all counts.  He never told PaRR any of this, and the first time that PaRR learned of this was at his deposition.  If Mr. Houston had told PaRR the truth about his criminal background, PaRR never would have signed an ICA with him.

**b.      PaRR has never had any contractual relationship with the other named Plaintiff.**

59.     PaRR has never had any relationship with the other named Plaintiff, Joseph Lomascolo, contractual or otherwise.  Mr. Lomascolo did apply to become a PaRR Independent Contractor in 2001, but he did not meet PaRR's eligibility criteria.  He was unable to demonstrate the requisite skill and experience, so PaRR never asked him to sign an ICA.

**c.      Mr. Houston was among the most efficient and most highly compensated of PaRR's Independent Contractors.**

**1.      Mr. Houston's High Earnings**

60.     In 2004, PaRR paid Mr. Houston $59,904 for the inspection services he performed as an Independent Contractor for PaRR.  PaRR issued to Mr. Houston a Form 1099 reporting this amount as "nonemployee compensation."  Mr. Houston testified, on Page 57 of his deposition, however, that he did not file a tax return in 2004, and that he has paid no income tax at all on his 2004 income.

61.     In 2005, the last full year in which Mr. Houston performed inspections for more than a few weeks for PaRR, twenty of PaRR's inspectors earned over $100,000.00 performing

housing inspections as Independent Contractors for PaRR.  Of the 2,897 Independent Contractors

that performed housing inspection services for PaRR in 2005, only fifteen earned more than Mr.

Houston.  The most productive inspector earned over $182,000.00 in that year.  In that year

alone, Mr. Houston was paid $118,765.81 by PaRR, and PaRR issued him a Form 1099,

reporting payment to him of "nonemployee compensation" in that amount.

62.     In 2006, PaRR paid Mr. Houston $30,314.95 for inspection services that he

provided under his ICA, and PaRR issued a Form 1099 to him reporting that amount as

"nonemployee compensation."  He testified on Page 58 of his deposition that he has not paid any

income tax on his income for 2006.

### 2.     Mr. Houston's Extensive Experience Before He Came to PaRR

63.     Despite his criminal background, Mr. Houston's extensive experience in the

disaster inspection field made him a highly unusual inspector.  Unlike most of PaRR's

Independent Contractors, he had performed over ten thousand inspections for other companies in

the seven years before PaRR won its first contract with FEMA.  Mr. Houston was able to

complete inspections far more efficiently than the majority of other Independent Contractors.  As

a result, he was able to make a far more money than over 98% of PaRR's other Independent

Contractors.  Using the year 2005 as an example, 2,897 inspectors performed disaster inspection

work for PaRR.  Of that number, Mr. Houston was among the 20 inspectors who earned more

than $100,000.00, placing him firmly in the top 1% of all PaRR inspectors in terms of earnings.

Only 15 inspectors earned more than Mr. Houston that year.

### 3.     Mr. Houston's Situation Was Different From That of The Large Majority of Other PaRR Independent Contractors

64.     Mr. Houston's situation is not similar to that of most of the PaRR Independent

Contractors in the proposed "PaRR Class" that he has described in his Complaint.  First, he never

would have been retained as an Independent Contractor if he had told the truth about his criminal background to PaRR.

65.     Second, despite that criminal background, Mr. Houston was among the most efficient and most highly compensated of PaRR's inspectors.

66.     Third, on the basis of Mr. Houston's experience, skill and high performance as a housing inspector, PaRR requested him to perform "Quality Control" inspections.  Mr. Houston agreed to perform "Quality Control" inspections in the continuing aftermath of Hurricane Katrina in March of 2006.  Only 1.8% of PaRR's inspectors in 2004 – 2007 were sufficiently highly-qualified to be asked to do "Quality Control" inspections.  Mr. Houston indicated on his Consultant Application that he had previously performed "Quality Control" inspections for ALLTECH, as stated in Paragraph 8 of the Second Supplemental Declaration of PaRR.  Thus, he had been among the inspectors most qualified to perform "Quality Control" inspections for ALLTECH.  Mr. Houston was paid 50% more for doing these "Quality Control" inspections than he was paid for doing standard inspections.

67.     Fourth, Mr. Houston has performed *no* work for PaRR since July 23, 2006, nearly two-and-a-half years ago.  On March 29, 2007, eight months before he filed his Complaint, Mr. Houston notified PaRR that he would not be available for further work as a result of an unspecified medical condition.  Accordingly, having not worked for PaRR for the last two-and-a-half years, it is difficult to see how Mr. Houston can credibly argue that he represents adequately the legal interests of the many inspectors who have performed disaster inspection work during that two-and-a-half year period.

68.     The amount of inspection work that any individual inspector is assigned is based upon the inspector's production history.  Inspectors who have a demonstrated ability to complete

a large volume of inspections, like Mr. Houston, receive a large volume of inspections to complete.  Inspectors who have a demonstrated ability to complete a smaller volume of inspections receive fewer inspections to complete.  In this way, inspection work flows to those most capable of performing it.

69.     As a result of his long experience as a disaster housing inspector, Mr. Houston demonstrated that he was very capable of performing a large number of inspections.  Consequently, he received more inspection work; indeed, more work than the vast majority of other PaRR Independent Contractors, and, as a result, he made more money than 98% of PaRR's other inspectors in 2005, as I have stated above.

70.     During the time of Mr. Houston's engagement, PaRR sought to deploy a culturally diverse workforce as part of a Cultural Diversity Plan, which was a requirement of its contract with FEMA.  According to that Cultural Diversity Plan, some individual inspectors were requested to respond to certain specific disaster locations because of a particular language proficiency, some particular social competency or their minority status.  Using demographic data, PaRR attempted to conform the make-up of the inspection force of specific deployments to the make-up of the disaster location.  FEMA evaluated PaRR's general performance on the basis of, among other things, its performance of the Cultural Diversity Plan.  FEMA does not require PaRR to implement a Cultural Diversity Plan under the Current FEMA Contract.

71.     Mr. Houston is an African-American.  (*See* Consultant Application attached to the Second Supplemental Declaration of PaRR as Exhibit No. 1.)  As a result, he was given the opportunity to accept deployments more often than other Independent Contractors who were not similarly situated to him.  As a consequence, Mr. Houston had more opportunities to work and,

thus, to make more money than the majority of inspectors who have no particular language proficiency, social competency and are not from an ethnic minority.

72.     In PaRR's experience, no inspector is similarly situated to any other inspector. This is because each inspector decides for himself or herself whether to accept a deployment to a specific disaster location.  When a disaster strikes, PaRR gives to those inspectors who have informed PaRR of their availability the opportunity to respond to the disaster location.  PaRR cannot force anyone to respond to any disaster.  Each inspector chooses for himself or herself whether to accept a deployment to any particular disaster site.  Each inspector is free to accept, or to turn down, a deployment opportunity.

73.     Similarly, each individual inspector who accepts a deployment to a particular disaster is free to choose for himself or herself when to start work and when to stop working each day.  No one forces him or her to work on any particular day or to work more than 40 hours in a week.  If any inspector chooses not to work on any particular day or to work more than 40 hours in a week, there is no penalty.  PaRR has no way to enforce any kind of penalty, as Mr. Frost explained in his deposition at Page 90.

74.     The only stimulus that inspectors have to work is economic.  Each inspector who chooses to complete more inspections will make more money than those who choose to work less.  Those who choose to complete fewer inspections will not make as much money as those who choose to work more.  Each inspector is, in this sense, the master of his or her own destiny.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on: November 20, 2008

Ronald P. Klause

# Exhibit 1

**Bracey, Denice**

| | |
|---|---|
| **From:** | Thomas Obert [tjo@fenix2.dol-esa.gov] |
| **Sent:** | Friday, May 19, 2000 10:01 AM |
| **To:** | 'Bracey, Denice' |
| **Subject:** | RE: Service Contract Act Revised |

Yes, SCA would apply to any contractor performing such contracts - a contract for services performed through the use of service employees. A service employee is defined as any person engaged in the performance of a contract unless that person is a bona fide professional, adminstrative, or executive employee as those terms are defined in 29 CFR Part 541. As set forth in section 4.155 of SCA Regulations, 29 CFR Part 4, therefore, coverage of service employees does not depend on any contractual relationship that may be alleged to exist between a contractor or subcontractor and such persons, .i.e, a person's status as an "owner-operator" or "independent contractor" is immaterial to coverage under SCA.

There is nothing under SCA that would prohibit your company from using its existing pay practices. However, for SCA compliance purposes, you would need to show that for each hour worked on a covered SCA contract that the inspectors receive at least the minimum monetary wage rate and fringe benefit (which are separate and distinct requirements) set forth in the applicable wage determination.

-----Original Message-----
From:    Bracey, Denice [SMTP:DBracey@dewberry.com]
Sent:    Friday, May 19, 2000 9:06 AM
To:      'tjo@fenix2.dol-esa.gov'
Subject:    FW: Service Contract Act Revised
Importance: High


> FEMA recently issued a modification incorporating the SCA in a
> solicitation (EMW-2000-RO-0018) Mod 4. The modification requires offerers
> to insert the following paragraph:
>
> "For proposal purposes, Inspectors shall earn no less than the minimum
> hourly wage of $20.00 PLUS fringes and overtime (time and a half) as
> applicable. This minimum amount shal apply to all Inspectors, whether
> contractor employee, subcontractors, or consultants. This does not
> preclude payment of Inspectors on a per inspection basis. Travel expenses
> shall be in addition to wages."
>
> Our company intends to utilize independent Housing Inspector contractors
> and do not intend to hire them as employees. We also intend to pay a per
> inspection rate rather than an hourly rate. This approach is common in
> the industry. We will issue contracts for the inspection services to each
> of the independent Inspectors prior to sending them to a disaster site,
> and will pay for travel expenses.There is no ceiling on the number of
> inspections an Inspector may do in a day. Each contracted Inspector gets
> a
> flat per inspection rate. Additionally, there are monetary incentives
> that are performance based. The independent Inspectors will have contracts
> with and/or provide the service for more than one company. Also, the work
> is sporadic and short term.

1

>
> We asked FEMA if we are subject to the SCA (based on the SCA paragraph
> above that is to be included in the solicitation) and must somehow factor
> in hourly wages and fringe benefits in the per inspection rate for each
> contracted Inspector.  FEMA suggested we contact you for a response.
>
> Could you provide guidance to us on this issue?
>
> If you need additional information I can be reached at 703/ 849-0245.
>
> Thank you.

2

PaRR 0001044

Exhibit 2

DOL and SCA Compliance Details

| Base Rate | Health Benefits | Fringes * | Pay for 40 Hours | Pay for Overtime (30 hrs./Wk) | Subsistence Pay | Total |
|---|---|---|---|---|---|---|
| $18.78 | $1.92 | $1.44 | $885.60 | $845.10 | $770.00 | $2,500.70 |
| Conversion to Per Inspection Amount ( assuming 8 inspections per day average) | | | | | | |
| Total Inspections completed in 7 days = | | | | | | 56 |

Equivalent Per Inspection Pay     $2,500.70 / 56     = $44.66

\* Fringes = 10 vacation days and 10 holidays per year for each inspector per SCA

20 x 8 = 160 hours per year (2 weeks vacation)

$$\frac{160 \times \$18.78}{2080} = \$1.44$$

25 x 8 = 200 hours per year (3 weeks vacation)

$$\frac{200 \times \$18.78}{2080} = \$1.81$$

30 x 8 = 320 hours per year (4 weeks vacation)

$$\frac{320 \times \$18.78}{2080} = \$2.89$$

$44.92 for Inspectors with 3 weeks vacation
$45.18 for Inspectors with 4 weeks vacation

Exhibit 3

**Details of PaRR's Inspector Compensation Package**

**Non Local Hired Inspectors**

**Non Local Hired Inspectors**

| Inspector Activity | Per Inspection Pay | Daily Rate |
|---|---|---|
| Normal Inspections | $44.66 | $0 |
| Remote Inspections | $66.99 | $0 |
| Conducting "Ride Alongs" | $54.66 | $0 |
| Functioning as Team Leader | $44.66 | $600.00 |
| Conducting QC Inspections | $49.66 | $0 |
| Receiving Ride Along Training | $0 | $22.14 x 8 + $110 = $287.12 |
| Travel to & from Disaster | | $22.14 x 8 = $177.12 |
| Normal inspections during project closeout | $44.66 | $175.00 |
| Down Time with no inspections | | $22.14 per Hr. |

| Local Hired Inspectors Living at Home | | |
|---|---|---|
| Normal Inspections | $37.16 | $0 |
| Remote Inspections | $55.74 | $0 |
| Conducting "Ride Alongs" | $47.16 | $0 |
| Functioning as Team Leader | $37.16 | $600.00 |
| Conducting QC Inspections | $42.16 | $0 |
| Receiving Ride Along Training | $0 | $0.00 |
| Travel to & from Disaster | | $0.00 |
| Normal inspections during project closeout | $37.16 | $175.00 |
| Down Time with no inspections | | $22.14 per hr. |