IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

|  |  |  |
|---|---|---|
| RONALD EUGENE HOUSTON, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:08cv0203 (AJT/JFA) |
| URS CORPORATION, et al., | ) ) ) | |
| Defendants. | ) ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PLAINTIFF'S GENERIC CLAIMS OF "WILLFUL" VIOLATIONS OF THE FAIR LABOR STANDARDS ACT**

Stephen M. Sayers (VSB No. 23066)
Thomas P. Murphy (VSB No. 30765)
Michael E. Kinney (VSB No. 65056)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
Telephone:  (703) 714-7400
Facsimile:  (703) 714-7410

James P. Naughton (VSB No. 25923)
HUNTON & WILLIAMS LLP
500 E. Main Street, Suite 1000
Norfolk, Virginia  23510
Telephone:  (757) 640-5300
Facsimile:  (757) 625-7720

*Counsel for the Defendants Partnership for Response and Recovery
and Dewberry & Davis LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

Introduction ............................................................................................................... 1

I.   Standard Of Review .............................................................................................. 2

II.  Undisputed Material Facts .................................................................................... 3

     A.   Background On The Disaster Housing Inspection Industry ............................................. 3

     B.   Houston's Work As An Alltech Independent Contractor .................................................. 4

     C.   Houston's Criminal Background And His Misrepresentations To PaRR ........................ 5

     D.   The Plaintiff Has Produced No Evidence To Support His Claim Of "Willful" Violations .............................................................................................................. 7

          1.   Houston's Sworn Deposition Testimony ................................................................ 7

          2.   Houston's Answers To PaRR's Discovery Requests Requiring Him To Specify All Evidence In His Possession As To His "Willfulness" Allegations ...................................................................................................... 8

     E.   PaRR And Dewberry Acted In Good Faith To Comply With The FLSA ................... 10

     F.   This Case Is The First Case Filed Against Alltech Or PaRR That Contends Independent Contractors Who Signed ICAs Are Really Employees ............................. 14

III. Disputed Material Facts .................................................................................... 14

Argument ............................................................................................................... 14

IV. Houston Has The Burden Of Proving A "Willful" Violation Of The FLSA ........................ 16

V.  Houston Has No Evidence Of Any Violation Of The FLSA, "Willful" Or Otherwise ......... 19

     A.   Uniform Industry Practice Over The Last Quarter Century .......................................... 20

     B.   Section 530 Of The Revenue Act Of 1978 ................................................................... 21

Conclusion ............................................................................................................. 22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................2

*Anderson v. N. Roanoke Veterinary Clinic*,
    No. 96-0250-R, 1997 U.S. Dist. LEXIS 12690 (W.D. Va. Aug. 1, 1997) ...........14, 21

*Barwick v. Celotex Corp.*,
    736 F.2d 946 (4th Cir. 1984) ........................................................2

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................16

*Bouchat v. Baltimore Ravens Football Club*,
    346 F.3d 514 (4th Cir. 2003) ........................................................2

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................2, 3

*Chao v. Self Pride, Inc.*,
    232 Fed. Appx. 280 (4th Cir. 2007)..................................................15

*Cleveland v. Policy Management System Corp.*,
    526 U.S. 795 (1999)................................................................2

*Cubias v.  Casa Furniture & Bedding LLC*,
    No. 1:06cv386, 2007 U.S. Dist. LEXIS 3380 (E.D. Va. Jan. 14, 2007)...............17, 18

*Davis v. Hartland Homes, Inc.*,
    No. 4:06cv3012, 2006 U.S. Dist. LEXIS 70599 (D. Neb. Sept. 28, 2006) .................17

*Debejian v. Atlantic Testing Laboratories, Ltd.*,
    64 F. Supp. 2d 85 (N.D.N.Y. 1999).................................................16

*Dole v. Elliott Travel & Tours, Inc.*,
    942 F.2d 962 (6th Cir. 1991) .......................................................19

*General Investment Corp. v. United States*,
    823 F.2d 337 (9th Cir. 1987) .......................................................21

*Gustafson v. Bell Atlantic Corp.*,
    171 F. Supp. 2d 311 (S.D.N.Y. 2001)..............................................16, 19

*Hanscom v. Carteret Mortgage Corp.*,
 Civil Action No. 1:06-CV-2483, 2008 WL 4845832
 (M.D. Pa. Nov. 5, 2008)...................................................................................15, 20

*Heath v. Perdue Farms, Inc.*,
 87 F. Supp. 2d 452 (D. Md. 2000) ...............................................................19

*Hughes v. Bedsole*,
 48 F.3d 1376 (4th Cir. 1995) .......................................................................3

*Martin v. Deiriggi*,
 985 F.2d 129 (4th Cir. 1993) .......................................................................18

*McLaughlin v. Richland Shoe Co.*,
 486 U.S. 128 (1988)............................................................................. *passim*

*Moore v. United Parcel Serv.*,
 No. 303-CV-1399L, 2004 WL 2339792 (N.D. Tex. Oct. 15, 2004), *aff'd*, 150
 Fed. Appx. 315 (5th Cir. 2005).....................................................................17

*Morrison v. International Programs Consortium, Inc.*,
 253 F.3d 5 (D.C. Cir. 2001) .........................................................................17

*Pachaly v. City of Lynchburg*,
 897 F.2d 723 (4th Cir. 1990) .......................................................................3

*Peters v. Jenney*,
 327 F.3d 307 (4th Cir. 2003) .......................................................................2

*Radobenko v. Automated Equipment Co.*,
 520 F.2d 540 (9th Cir. 1975) .......................................................................2

*Reich v. Waldbaum*,
 52 F.3d 35 (2d Cir. 1995) .............................................................................18

*Rowland v. America General Finance*,
 340 F.3d 187 (4th Cir. 2003) .......................................................................17

*Schneider v. City of Springfield*,
 102 F. Supp. 2d 827 (S.D. Ohio 1999) .......................................................19

*Truslow v. Spotsylvania County Sheriff*,
 783 F. Supp. 274 (E.D. Va. 1992) ...............................................................15, 16

*Villegas v. Dependable Construction Services, Inc.*,
 Civ. No. 4:07-cv-2165, 2008 WL 5137321 (S.D. Tex. Dec. 8, 2008).........................17

*Williams v. Maryland Office Relocators*,
    485 F. Supp. 2d 616 (D. Md. 2007) ............................................................................15

## **STATUTES**

Section 530 of the Revenue Act of 1978,
    26 U.S.C. § 3401, note (1979). ................................................................................21

29 U.S.C. § 255(a) (1994).................................................................................................14

The McNamara-O'Hara Service Contract Act of 1965,
    41 U.S.C. §§ 351-58 (2008)........................................................................................11

### Introduction

The Plaintiff, Ronald E. Houston ("Houston"), has leveled the vague, but serious,

allegation against the Defendants that they have "knowingly" and "willfully" violated the Fair

Labor Standards Act of 1938 ("FLSA").  (Compl. ¶¶ 47, 48 & 84.)  Discovery has revealed that

there is absolutely no factual basis for Houston's generic and unsupported allegations of "willful"

violations of the FLSA on the part of the two remaining Defendants, Partnership for Response

and Recovery ("PaRR") and Dewberry & Davis LLC ("Dewberry").[1]   Houston himself has

admitted this in the following exchange during his deposition:

> Q:  . . . What evidence do you have that these . . . defendants
> knowingly misclassified you?
>
> A:  **I don't have any evidence.**
>
> Q:  None at all?
>
> A:  **None.**

(Ex. "A;" Houston Dep. 84:4-8 (emphasis added).)

The standard statute of limitations for alleged violations of the FLSA is two years.  Only

in those unusual situations where a defendant's conduct is sufficiently egregious as to be

considered "willful" is the statute of limitations extended to three years.  The United States

Supreme Court has specifically addressed the exacting standard required for "willful" violations

of the FLSA in the seminal case of *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988).  The

conduct at issue must not be merely negligent, but the plaintiff is required to prove that "the

---

[1]  Houston also named URS Corp. as a Defendant with no factual basis for doing so.  In his Complaint, Houston claimed that he was a URS Corp. employee.  (Compl. ¶ 7.)  He never was, however, and admitted this in his deposition.  (Ex. "A;" Houston Dep. 63:15-17.)  Similarly, he claimed that URS Corp. was part of the PaRR "joint venture."  (Compl. ¶ 11.)  It never was.  Although these factual errors were repeatedly brought to the Plaintiff's attention, it was not until URS Corp. filed a Motion for Summary Judgment that the Plaintiff finally consented to the dismissal of URS Corp. from this case, with prejudice.  The Complaint also alleges that Houston was a Dewberry employee (Compl. ¶ 9).  In his deposition, however, Houston admitted that he has never been a Dewberry employee.  (Ex. "A;" Houston Dep. 63:20-23.)  It is unclear, therefore, why Dewberry has been named as a Defendant.

employer either *knew* or showed *reckless disregard* for the matter of whether its conduct was prohibited by the statute." *Id.* at 133 (emphasis added).

Houston has not shown, and cannot show, that either PaRR's or Dewberry's conduct was in any way "willful." The undisputed facts in this case establish a painstaking effort on PaRR's part to comply with all applicable federal laws and regulations, including the FLSA. There are no disputes of material fact on this issue. Therefore, PaRR and Dewberry request this Court to grant them partial summary judgment on the claims of "willfulness" made in Paragraphs 47, 48 and 84 of the Complaint, pursuant to Fed. R. Civ. P. 56(b).

## I.   STANDARD OF REVIEW.

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). This is accomplished by determining "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In order for there to be a "genuine issue for trial" there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*; *accord Bouchat v. Baltimore Ravens Football Club*, 346 F.3d 514, 519 (4th Cir. 2003). It is well-settled that "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position, is not sufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252; *accord Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). Also, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) (citing *Radobenko v. Automated Equip. Co.*, 520 F.2d 540, 544 (9th Cir. 1975)); *Cleveland v. Policy Mgmt. Sys. Corp.* 526 U.S. 795, 806 (1999) (reporting that lower courts, with "virtual unanimity," have held "that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his

or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity.").

"[T]he plain language of Rule 56(c) *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp*., 477 U.S. at 322 (emphasis added.) The "obligation of the nonmoving party is 'particularly strong . . . when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir. 1990).)

Houston bears the burden of proving that PaRR and Dewberry violated the FLSA "willfully." He has no evidence to support this claim, not even a scintilla.

## II.   UNDISPUTED MATERIAL FACTS.

Houston has not provided a single fact, other than the conclusory allegations that are autonomically incanted in Paragraphs 47, 48 and 84 of the Complaint, to support his contention that PaRR and Dewberry have "willfully" violated the FLSA. Houston's sworn testimony, his admissions, his answers to interrogatories and the documents he has produced demonstrate that there is no such evidence.

### A.   Background On The Disaster Housing Inspection Industry.

The Federal Emergency Management Agency ("FEMA") is a division of the United States Department of Homeland Security. FEMA administers a Housing Program, pursuant to the Disaster Relief and Emergency Assistance Act, as amended by the Robert T. Stafford Act. (Ex. "J;" Decl. of Ronald P. Klause ¶ 8.) This program provides emergency assistance to homeowners and renters who have been the victims of natural disasters, but who have inadequate insurance, or no insurance at all, to cover their often devastating losses. (*Id*.) In order to

determine the amount of Government aid that will be provided, their residences must be inspected. (*Id.* at ¶ 9.) Given the large scale of most disasters, such as Hurricane Katrina, there may be hundreds of thousands of disaster housing inspections that have to be performed, and performed quickly, to ensure that aid makes its way into the hands of disaster victims at their most vulnerable hour of need. (*Id.*)

It has been the uniform industry practice for over twenty-five years for FEMA to meet this need by retaining independent contractors to perform disaster housing inspections. (*Id.* ¶ 6.) Prior to 2001, when PaRR was awarded its first FEMA contract, the provision of disaster housing inspections had been coordinated by a variety of Government contractors, including Vulcan Services, Inc., Scientific Services, Inc., Suncoast Associates and Computer Science Corporation. (*Id.*) Each of these companies retained independent contractors to perform the actual disaster housing inspections for at least the last twenty-five years. (*Id.*)

The performance of these inspections requires direct interaction with the victims, and the inspectors are often the first people the victims meet after a disaster. (Ex. "I;" Second Supplemental Declaration of PaRR ¶ 2.) The housing inspectors are necessarily given access to the victims' homes, as well as to the confidential personal and financial information on the victims' aid applications. (*Id.* ¶ 2.) For this reason, housing inspectors must submit to a background check, in order to screen out those individuals who have criminal pasts. (*Id.*, Ex. "B;" Frost Dep. 136:7-12 ("we have to protect the innocent victims and so we want to minimize the potential for anybody being hurt out there . . . .").)

### B.   Houston's Work As An Alltech Independent Contractor.

Prior to becoming "disabled" in 2006, Houston had performed disaster housing inspections as an independent contractor since 1994. (Ex. "A;" Houston Dep. 19:7-25.) In fact, prior to signing his first Independent Contractor Agreement with PaRR, Houston completed over

13,000 inspections for Vulcan Services, Inc., Scientific Services, Inc., Suncoast Associates, Parsons Brinkerhoff, Inc. and Alltech, Inc. ("Alltech").  (Ex. "D;" Houston Response to Defendants' Request for Admissions ("RFA") No. 74.)

Houston performed housing inspections for Alltech from 1995 until mid-2002, pursuant to a series of Independent Contractor Agreements that he and Alltech signed.[2]  At no time did Houston ever contend to Alltech that he was being "misclassified," or that he should be treated as an Alltech employee.  Indeed, Houston found that being an independent contractor for Alltech was highly lucrative.  He earned a total of $335,547.40 in 1099-MISC. "nonemployee compensation" from Alltech.  (*See* Exhibit "N;" ledger entry showing total Alltech payments to Houston.)  Houston did not prepare or file any tax returns for the years 1995 through 2002, so he has paid no federal or state income tax on any of these substantial earnings.

### C.   Houston's Criminal Background And His Misrepresentations To PaRR.

At the start of his relationship with PaRR, Houston signed a Task Order certifying to PaRR that he had never "been arrested, charged or convicted of any felony charge as of the start of this Task Order."[3]  (Ex. "D;" Houston Response to RFA No. 25 & Ex. No. 5 to RFAs.)  This was not true.  Houston had, in fact, been arrested, charged *and* convicted of a felony, by a California jury, in 1990.[4]  (*See id.*; Houston Responses to RFA Nos. 24-44; *see also* Ex. "K.")

---

[2]  A copy of the first Independent Contractor Agreement that Houston signed with Alltech is attached as Exhibit "L." In it, he stated that he was a "sole proprietorship" and was engaged in his "own independent business."  *Id.* at 1, 2.

[3]  Houston similarly denied having been arrested, charged, or convicted of a felony on his Consultant Review Application.  (Ex. "D;" Houston Response to RFA No. 46 and Ex. No. 1 to RFAs.)

[4]  Houston was a Nevada resident when he contracted with PaRR, and when his background check was performed. That background check failed to uncover his felony conviction in the State of California.

Houston claims that his felony conviction was subsequently "expunged" in December, 1991.  (*See* Ex. "D;" Houston Response to RFA No. 24.)  PaRR does not know whether this is true, but, even if it is, any such "expungement" would not be relevant to PaRR's questions to him whether he had ever been arrested for, charged with or convicted of a felony.

As he had done year after year with Alltech, Houston also entered into an "Independent Contractor Agreement" ("ICA") with PaRR.  (*See* Ex. "D;" Houston Response to RFA No. 4.) As part of this ICA, Houston was contractually obliged to "maintain appropriate records documenting hours worked and rates paid per disaster or task order . . . ." (*Id.*; Houston Response to RFA No. 54.)  He completely failed to do so.  (*Id.*; Houston Responses to RFA Nos. 53-55; *see also* Ex. "H;" Houston Supplemental Responses to Defendants' Request for Production of Docs. Nos. 20 & 21.)  In fact, he has now admitted that, as a result of this breach of contract, he has *no* record of any of the hours that he supposedly worked from November 8, 2004 until July 23, 2006 (the date of the last inspection that he performed for PaRR).  (Ex. "D;" Houston Responses to RFA Nos. 55 & 56; *see also* Ex. "H;" Houston Supplemental Responses to Defendants' Request for Production of Docs. Nos. 20 & 21.)

Performing disaster housing inspections for PaRR was as highly profitable for Houston as the inspections he had conducted for Alltech.  Between 2003 and 2006, Houston was paid more than $305,000 as a disaster housing inspector.  (Ex. "A;" Houston Dep. 57:6-13.)  Houston did not file or pay any income taxes on the Form 1099-MISC. "nonemployee compensation" paid to him by PaRR in 2004, 2005 or 2006. (Ex. "D;" Houston Responses to RFA Nos. 20-22, 93 & 104, and Ex. 20-22 to RFAs.)[5]

---

[5]  Houston now claims that he did file a belated tax return for 2005 in 2007, in which over $66,000 in undocumented Schedule "C" business deductions were taken.  (Ex. "D;" Houston Response to RFA No. 98.)  Houston admits he has no invoices or other records to back up these claimed business deductions.  (*Id.*; Houston Responses to RFA Nos. 54 & 55; *see also* Ex. "H;" Houston Supplemental Responses to Defendants' Request for Production of Docs. Nos. 20 & 21.)  He still has not paid any income tax for that year, however, even though he received Form 1099-MISC. "nonemployee compensation" from PaRR of over $118,000.  (Ex. "D;" Houston Responses to RFA Nos. 95, 96 & 99.)

### D.     The Plaintiff Has Produced No Evidence To Support His Claim Of "Willful" Violations.

#### 1.     Houston's Sworn Deposition Testimony.

Houston's own deposition testimony has confirmed that he knows of *no* facts to support his bald allegations of "willfulness."  Houston never told anyone at PaRR, either in writing or orally, that he believed he was being misclassified as an independent contractor, rather than an employee of PaRR.  (Ex. "A;" Houston Dep. 45:20-46:1; *see also* Ex. "B;" Frost Dep. 120:21-121:4.)  No one from PaRR has ever told Houston that PaRR was required to pay him overtime compensation.  (Ex. "A;" Houston Dep. 86:17-20.)  Houston has no evidence that PaRR has ever been investigated by anyone, including the Internal Revenue Service ("IRS") or the United States Department of Labor ("DOL"), for any alleged violations of the FLSA.  (*Id.* at 85:9-20.)  Likewise, Houston has no evidence that any representative of the DOL has ever communicated to PaRR that its practice of using independent contractors, a practice that other contractors had followed uniformly for twenty-five years and more, was in any way unlawful.  (*Id.* at 86:12-16.)  Neither does Houston have any evidence that PaRR has withheld or destroyed any records to thwart an actual or potential investigation by the DOL.  (*Id.* at 87:16-20.)  More broadly, Houston has no evidence of any scheme on the part of PaRR to cover up any purported violations of the FLSA.  (*Id.* at 85:21-24.)  For example, Houston has no evidence that PaRR made a business decision to use independent contractors rather than employees because PaRR's overhead would otherwise be too high.  (*Id.* at 86:21-87:1.)  Nor does Houston have any evidence that PaRR has willfully attempted to conceal his purported eligibility for overtime by hiring him as an independent contractor.  (*Id.* at 85:4-8.)

In short, Houston stands before the Court with no evidence that PaRR has knowingly or recklessly violated the FLSA in any conceivable way.  He has *nothing* to back up the bare allegations of "willfulness" made in the Complaint.

> **2.**  **Houston's Answers To PaRR's Discovery Requests Requiring Him To Specify All Evidence In His Possession As To His "Willfulness" Allegations.**

PaRR propounded its First Set of Interrogatories to Houston as soon as the Scheduling Order was issued in this case.  Interrogatory No. 4 read as follows:

> State the precise factual basis for your allegation in Paragraphs 47, 48 and 84 of the Complaint that the alleged violations of the Fair Labor Standards Act ("FLSA") on the part of PaRR or Dewberry are or were, supposedly, "willful" or "knowing."  In answering this Interrogatory, identify all persons who have knowledge of these assertedly "willful" or "knowing" violations of the FLSA, and state exactly how each person obtained this knowledge.

(Ex. "E.")  Houston's economic answer to this interrogatory was that "discovery and investigation are ongoing regarding this."  (*Id.*; Houston Answer to Interrog. No. 4.)

No details concerning the identity of the persons with knowledge of these assertedly "willful" or "knowing" violations of the FLSA were provided, even though the Complaint was filed on November 8, 2007, and had been pending for nearly 14 months by the time that this interrogatory answer was provided to PaRR.

After receiving this clearly inadequate answer, counsel for PaRR and Dewberry promptly communicated with Houston's counsel, to request a supplemental interrogatory answer that provided the information requested.  (*See* Ex. "F.")  The Supplemental Answer to this Interrogatory was scarcely more illuminating.  Houston contended that he had been told by someone named "Mary Vasquez" ("Ms. Vasquez"), assertedly in August of 2007, that the IRS had already made a determination that disaster housing inspectors were employees rather than independent contractors.  (Ex. "G;" Houston Supplemental Answer to PaRR Interrog. No. 4.)

Houston also claimed to know that a previous determination, made by the IRS on August 8, 2006, in the case of one "Chad B. Smith," apparently determined him to be an employee rather than an independent contractor.  (*Id.*)

PaRR knew nothing about either determination.  Chad B. Smith is apparently a Canadian citizen who is attempting to organize a union of disaster housing inspectors called PAFI (the "Professional Association of FEMA Inspectors.")  He is a former Alltech employee.  He has never performed any services for PaRR.  PaRR was not involved in the process by which Smith was allegedly found to be an employee, rather than an independent contractor, for federal tax purposes, by the IRS.  PaRR was not invited to participate in that process and it did not do so.  Similarly, PaRR was not involved in the communications with Ms. Vasquez, who is, seemingly, an "employment tax technician" with the IRS.  PaRR was not given the opportunity to be heard in Houston's case either.

Furthermore, it appears that Houston became "disabled" at some point immediately prior to March of 2007.  He admits that, on March 29, 2007, he contacted PaRR's Operational Headquarters in Winchester, Virginia, and informed the Training Coordinator that he was "no longer available to perform housing inspections because of a medical condition."  (Ex. "D;" Houston Response to RFA No. 71.)  In the same month, he apparently contacted Ms. Vasquez about the employee/independent contractor status of disaster inspectors.  (*See* Ex. "E;" Houston Answer to PaRR Interrog. No. 7.)  After Houston approached the IRS, the "employment tax technician" apparently "sent me a form to fill out which states that I was an employee rather than an independent contractor with respect to my work for PaRR.  Thereafter in or about October 2007, I took the IRS form and the letter from Ms. Vasquez to the Social Security Department for

apply [sic] for Social Security.  I believe that's the extent of my communications with governmental agencies regarding this issue."  (*Id.*)

The letter that the "employment tax technician" from the IRS sent to Houston is *not* a "determination letter" as he claims.  The IRS "employment tax technician" expressly stated in this letter that "this office will not issue a determination letter at this time."  (Ex. "M.") Accordingly, the chronology is clear.  Houston told PaRR, at the end of March 2007, that he was no longer able to perform disaster housing inspections, and it is evident that he had decided to seek social security benefits.  As part of that effort, he contacted the IRS.  The letter that he received from the "employment tax technician" at the IRS, in August of 2007, was sent to him more than a year after he had last performed services as a housing inspector for PaRR.  Houston performed no such services after July 23, 2006.  Furthermore, this letter was written to him five months after he had advised PaRR that he was no longer available to perform housing inspections because of an unspecified "medical condition."  (Ex. "D;" Houston Response to RFA No. 71.)

**E.**     **PaRR And Dewberry Acted In Good Faith To Comply With The FLSA.**

In early 2000, FEMA issued a Request for Proposals ("RFP") seeking bids for the provision of disaster housing services.  PaRR was one of the firms that prepared a proposal in response to the RFP.  (Ex. "J;" Decl. of Ronald P. Klause ¶ 7.)  Before the submission of the final proposals, FEMA amended the RFP with Amendment A004.  (*Id.* at ¶ 13.)  This Amendment required PaRR, as well as the other bidders, to show how they proposed to comply

with both the Service Contract Act ("SCA")[6] and the FLSA. *Id.* Specifically, Amendment A004 required that:

> For proposal preparation purposes, Inspectors shall earn no less than the minimum hourly wage of $20.00 PLUS fringes *and overtime (time and a half)*, as applicable. This minimum amount shall apply to all inspectors, whether contractor employees, subcontractors or consultants. This does not preclude payment of Inspectors on a per inspection basis. Travel expenses shall be in addition to wages.

*Id.* (emphasis added.)

In order to ensure that it would be able to comply with all the federal applicable wage and hour laws, PaRR's contracts manager, Denice Bracey, consulted Thomas Obert, a senior wage and hour analyst at the DOL. (*Id.* at ¶ 14.) Ms. Bracey explained to Mr. Obert that:

> Our company intends to utilize independent Housing Inspector contractors and do not intend to hire them as employees. We also intend to pay a per inspection rate rather than an hourly rate. This approach is common in the industry. We will issue contracts for the inspection services to each of the independent contractors prior to sending them to a disaster site, and will pay for travel expenses . . . . Each contracted Inspector gets a flat per inspection rate.

(*Id.*) Ms. Bracey then requested the DOL's guidance on whether PaRR should "factor in hourly wages and fringe benefits in the per inspection rate for each contract inspector." (*Id.*)

Mr. Obert advised her that "for SCA compliance purposes, [PaRR] would need to show that for each hour worked on a covered SCA contract that the inspectors receive at least the minimum monetary wage rate and fringe benefit (which are separate and distinct requirements) set forth in the applicable wage determination." (*Id.* at ¶ 16.) This advice was considered in, accepted by and incorporated into PaRR's bid to FEMA. (*See id.* at ¶ 17; *see also* Ex. "B;" Frost

---

[6]  The McNamara-O'Hara Service Contract Act of 1965, 41 U.S.C. §§ 351-58 (2008), requires contractors providing services to the Federal Government to pay workers no less than specified minimum amounts for specific classes of workers, as determined by the DOL.

Dep. 80:6-10) ("[The overtime component] is built into the [per-inspection] rate, and it meets the Service Contract Act requirements, which was a requirement of the contract.").)

On July 31, 2007, PaRR was notified that its bid fell within the competitive range and PaRR was invited to enter into formal contract negotiations with FEMA.  (Ex. "J;" Decl. of Ronald P. Klause ¶ 18.)  The RFP was also amended on this date to incorporate the DOL's determination of the minimum amount of compensation that would have to be paid to all disaster housing inspectors (the "DOL Determination").  (*Id.* at ¶ 19.)  The DOL Determination replaced the $20 per-hour rate established by Amendment A004, and established that the minimum per-inspection compensation that had to be paid to housing inspectors would be $18.78, plus an additional amount for the monetary value of certain required fringe benefits.  (*Id.*)

Next, FEMA asked PaRR to demonstrate that its proposed inspector compensation plan complied with both the SCA and the DOL Determination.  (*Id.* at ¶ 20) (*see also* Ex. "B;" Frost Dep. 126:10-16) ("FEMA did require us to explain and document and provide to them the documentation on how we met the Service Contract Act rate requirement that was a requirement in the contract.")  To satisfy this request, PaRR submitted, along with its Final Revised Business Proposal, a chart showing how PaRR had calculated the per-inspection fee to be paid to disaster housing inspectors.  (Ex. "J;" Decl. of Ronald P. Klause ¶ 20.)  This mathematical model presumed a 70-hour workweek, and it included payment for 30 hours of overtime.  (*Id.* at ¶ 22.)  Ultimately, the 2001 per-inspection rate was set at $44.66 for standard inspections.[7]  This rate was reached by dividing the sum of the minimum compensation rate (together with the monetary

---

[7]  There are various types of inspections.  "Standard" inspections are just that.  They must generally be completed within 72 hours of PaRR's receiving the inspection request from FEMA.  "Priority" inspections have to be completed within 24 hours, rather than the normal FEMA turnaround time of 72 hours.  "Remote" inspections require travel beyond the usually confined disaster area.  "Quality Control" inspections are re-inspections performed by a small number of unusually experienced, efficient inspectors like Houston.  The per-inspection rate for "priority," "remote" and "Quality Control" inspections is considerably higher than the rate for "standard" inspections.  (*See* Ex. "D;" Houston Response to RFA No. 19, and Ex. 19 to RFAs at p. 0-5.)

value of fringe benefits) prescribed by the DOL Determination, *plus the overtime component* and subsistence payments, by a presumed average fifty-six inspections per-week.  (*Id.* at ¶ 24.)

The inclusion of an overtime pay component in the per-inspection rate meant that every inspector would receive payment for overtime, whether or not he or she actually worked in excess of forty hours in any particular week.  (*Id.* at ¶ 26; Ex. "B;" Frost Dep. 124:1-16.)  PaRR also presented this information at business meetings with FEMA, along with a chart breaking down each of the components of its per-inspection rate.  (Ex. "B;" Frost Dep. 123:13-22.)

PaRR's bid was accepted.  PaRR entered into its first contract with FEMA on February 14, 2001.  (Ex. "J;" Decl. of Ronald P. Klause ¶ 27.)  During the six years that PaRR performed this contract, FEMA never once suggested to PaRR that the per-inspection fee may not be in compliance with the SCA, the FLSA, or any other federal law.  (*Id.* ¶ 29.)

Having been awarded the FEMA contract, PaRR notified all of its independent contractors, through its secure website, that the per-inspection fee paid to them included the equivalent of an hourly wage, the monetary value of fringe benefits, *and overtime*.  (*Id.* ¶ 30; Ex. "B;" Frost Dep. 126:20-22.)  Specifically, Policy P001 described these payment details and it was available to all of PaRR's inspectors in PaRR's Disaster Housing Inspector Manual as well as on PaRR's secure website, since at least December 1, 2003.  (*Id.* at 79:16-18.)  This Policy informed all inspectors that "[t]he per-inspection rate offered by PaRR . . . includes the equivalent of an hourly wage, the monetary value of fringe benefits, and projected overtime." (*See* Ex. "D;" Houston Response to RFA No. 19, and Ex. 19 to RFAs.)  Houston admits that he had access to Policy P001, at all times relevant to this case; that Policy P001 has been continuously present on the PaRR website since December 1, 2003; and that he actually read this

Policy specifically informing him that the per-inspection rate paid to him included overtime.

(*See* Ex. "D;" Houston Response to RFA Nos. 19, 45, 57 & 58; *see also* Ex. 19 to RFAs.)

> **F.      This Case Is The First Case Filed Against Alltech Or PaRR That Contends Independent Contractors Who Signed ICAs Are Really Employees.**

Prior to the filing of this case, no one had ever suggested to PaRR that its use of independent contractors to perform disaster housing inspections supposedly runs afoul of the requirements of the FLSA.  PaRR has never been investigated for any alleged violation of the FLSA.  (Ex. "J;" Decl. of Ronald P. Klause ¶ 51.)  Nor has any Government agency, including the IRS and the DOL, ever informed PaRR that its practice of using independent contractors, or its method of paying its independent contractors, violates any provision of the FLSA, or any other Federal wage or hour law for that matter.  (*Id.* at ¶¶ 51-52.)  Finally, PaRR is aware of no Federal or state court decision holding that FEMA disaster housing inspectors are employees rather than independent contractors, and it knows of no Administrative Letter issued by the DOL Wage and Hour Division determining that disaster housing inspectors must be classified as employees, rather than as independent contractors.  (*Id.* at ¶ 53.)

**III.      DISPUTED MATERIAL FACTS.**

None.

# ARGUMENT

The normal limitations period for FLSA actions is two years.  *Anderson v. N. Roanoke Veterinary Clinic*, No. 96-0250-R, 1997 U.S. Dist. LEXIS 12690, *15 (W.D. Va. Aug. 1, 1997) (citing 29 U.S.C. § 255(a) (1994).)  Only if the plaintiff can establish a "willful" violation of the FLSA may this two-year limitations period be elasticized to three years.  *Id.*  This is a challenging factual hurdle to clear.  Findings of "willful" violations are rare.  A violation may be found to be "willful" only in unusual circumstances:  if an "employer either *knew or showed*

*reckless disregard* for the matter of whether its conduct was prohibited by the statute . . . ." *McLaughlin*, 486 U.S. at 133 (emphasis added.)  Houston has come nowhere close to clearing this hurdle.  He admits that he knows of *no* facts to support the bare-bones legal conclusions aired in Paragraphs 47, 48 and 84 of his Complaint.

 *McLaughlin* sets a high standard for good reasons.  The Supreme Court has underscored the important distinction between "willful" violations and non-willful ones: "[t]he fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw *a significant distinction between ordinary violations and willful violations." Id.*  (emphasis added.)  Thus, an FLSA plaintiff making a "willful" violation claim bears the demanding burden of establishing that the employer "either knew or showed reckless disregard for the matter whether [their] conduct was prohibited by the statute." *Truslow v. Spotsylvania County Sheriff*, 783 F. Supp. 274, 279 (E.D. Va. 1992) (quoting *McLaughlin*, 486 U.S. at 133.)

 The Fourth Circuit has closely followed the standard articulated in *McLaughlin*, and noted that the Supreme Court has "*instruct[ed] us to look for an actually malignant—not merely careless—mental state*." *Chao v. Self Pride, Inc.*, 232 Fed. Appx. 280, 287 (4th Cir. 2007) (unpublished) (citing *McLaughlin*, 486 U.S. at 133) (emphasis added).

 One district court in this Circuit has distilled the post-*McLaughlin* cases into two categories: (1) those in which there is evidence that a defendant had previously been investigated for FLSA violations and fails to change its evil ways; and (2) those in which there is evidence of a scheme by the employer to violate the FLSA and to cover up those violations.  *Williams v. Maryland Office Relocators*, 485 F. Supp. 2d. 616, 621 (D. Md. 2007); *accord Hanscom v. Carteret Mortgage Corp.*, Civil Action No. 1:06-CV-2483, 2008 WL 4845832, *5 (M.D. Pa.

Nov. 5, 2008) (explaining that "willful violations are generally found in cases where an employer had information that its practices were *illegal*") (emphasis in original).  Houston has admitted that he has absolutely no evidence to place the facts of this case into either one of those categories.  (Ex. "A;" Houston Dep. 84:4-88:1.)  Furthermore, the evidence before the Court anesthetizes any suggestion of bad intent on PaRR's part, let alone the "malignant" intent required by *Chao*.

IV.    <u>HOUSTON HAS THE BURDEN OF PROVING A "WILLFUL" VIOLATION OF THE FLSA.</u>

Houston must show that PaRR and Dewberry "either knew or showed reckless disregard for the matter whether [their] conduct was prohibited by the statute."  *Truslow*, 783 F. Supp. at 279 (quoting *McLaughlin*, 486 U.S. at 133).  He cannot simply rely upon the bare, unsupported and legally conclusory allegations of his Complaint.  After *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), litigants are not free to do this.  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires *more than labels* and *conclusions*, and a *formulaic recitation of the elements of a cause of action* will not do."  550 U.S. at 555 (emphasis added.)  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  Houston is utterly unable to put *any* such factual allegations before the Court.  All he has done is to parrot formulaic labels and conclusions of "willfulness" in his Complaint, without providing any facts.

In view of *McLaughlin*'s exacting requirements, courts have routinely declined to extend the two-year limitations period where a plaintiff has "merely concluded that willfulness and recklessness existed, without pointing to any concrete evidence in the record."  *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311, 324 (S.D.N.Y. 2001); *accord Debejian v. Atlantic Testing Labs., Ltd*, 64 F. Supp. 2d 85, 92 (N.D.N.Y. 1999) (applying the 2-year statute of limitations where the plaintiff offered no evidence that the defendant knew it was violating the FLSA);

*Moore v. United Parcel Serv.*, No. 303-CV-1399L, 2004 WL 2339792, *13 (N.D. Tex. Oct. 15, 2004) (granting summary judgment to defendant where the plaintiff offered "no other evidence of willful conduct other than this conclusory statement."), *aff'd*, 150 Fed. Appx. 315 (5th Cir. 2005).

This is precisely the predicament in which Houston finds himself.  He has admitted that he has *no* evidence that PaRR knowingly violated the FLSA.  His damning admission on this score repays repetition:

> Q:  . . . What evidence do you have that these three defendants knowingly misclassified you?
>
> A:  *I don't have any evidence*.
>
> Q:  None at all?
>
> A:  *None*.

(Ex. "A;" Houston Dep. 84:4-8 (emphasis added).)  By his own admission, therefore, the unusual circumstances required to extend the FLSA's normal two-year limitations period to three years are not present in this case.[8]

One fairly recent case from this Court drives home the point.  It is the extraordinary case, indeed, where an alleged employer's conduct will be found to be so egregious as to meet *McLaughlin*'s exacting requirement of "a deliberate scheme to evade the FLSA's overtime

---

[8]  The entire weight of Houston's allegation of "willful" conduct rests on one letter from an IRS "employment tax technician." This letter, on its face, is hearsay reciting hearsay, and it is inadmissible.  *See Rowland v. Am. Gen. Fin.*, 340 F.3d 187, 194 (4th Cir. 2003); *Davis v. Hartland Homes, Inc.*, No. 4:06cv3012, 2006 U.S. Dist. LEXIS 70599, *23 (D. Neb. Sept. 28, 2006) (observing that IRS determination letter was hearsay, and opinions in it were not entitled to any weight.)  Lastly, the undisputed facts show that the IRS did not send this letter to Houston until nine months *after* he had last performed disaster housing inspections for PaRR.  (Ex. "D;" Houston Response to RFA No. 71.)

In *Morrison v. International Programs Consortium, Inc.*, 253 F.3d 5, 10 (D.C. Cir. 2001), the D.C. Circuit held that an IRS "Determination Letter" had been properly excluded from evidence in an FLSA case.  Similarly, in *Villegas v. Dependable Construction Services, Inc.*, Civ. No. 4:07-cv-2165, 2008 WL 5137321 (S.D. Tex. Dec. 8, 2008), the plaintiffs urged the court to apply the three-year statute of limitations, in part, because the defendant had changed its method of paying its employees after it settled another case, filed in 2006, which had alleged violations of the FLSA's overtime provisions on the defendant's part.  The court rejected this argument because "a lawsuit filed in 2006 is immaterial to job classifications made prior to that year," and, as a consequence, the court applied the standard two-year statute of limitations.  *Id.* at *27.

requirements, or at a minimum, reckless disregard for compliance with the statute." *Cubias v. Casa Furniture & Bedding LLC*, No. 1:06 cv 386, 2007 U.S. Dist. LEXIS 3380, *8 (E.D. Va. Jan. 16, 2007). In *Cubias*, Judge Cacheris found that an owner of two furniture companies had engaged in a ham-handed and deliberate effort to skirt the FLSA's overtime requirements by paying his employees from one company's account for all hours worked *under* 40 per-week, and from another related company's account for all hours worked *over* 40 per-week. *Id.* at *2. This is exactly the sort of egregious conduct that is required before the *McLaughlin* standard of "willfulness" will be satisfied. Houston, however, has testified: "I don't have any evidence of that." (Ex. "A;" Houston Dep. 85:21-86:2.)[9]

Similarly, in *Martin v. Deiriggi*, 985 F.2d 129 (4th Cir. 1992), the Fourth Circuit found that *McLaughlin*'s elevated "willfulness" standard had been met, and affirmed the district court's application of the three-year limitations period based on evidence that the employer had deliberately destroyed some records, and withheld others from the DOL, in an attempt to impede a DOL investigation. *Id.* at 136. Houston has admitted that he has no evidence of this sort of conduct by PaRR: "[I have] no evidence that PaRR has destroyed or withheld any records in order to block a DOL investigation of potential FLSA violations." (Ex. "A;" Houston Dep. 87:16-20.)

Other cases have found "willful" violations where the DOL had investigated past FLSA infractions by the employer. *See, e.g., Reich v. Waldbaum*, 52 F.3d 35, 41 (2d Cir. 1995). Houston had no idea whether the DOL's Wage and Hour Division has ever conducted an investigation of PaRR. (Ex. "A;" Houston Dep. 86:7-11.) In fact, no such investigation has ever been conducted. (Ex. "J;" Klause Decl., ¶ 51.) Similarly, other courts have found a "willful"

---

[9] At Houston's deposition, PaRR's counsel specifically employed the language used in the relevant cases to ask questions of Houston in order to establish that he had no knowledge of any "willful" violation of the FLSA of the types involved in those cases.

violation of the FLSA when the DOL had notified the employer that its practices likely fell afoul

of the FLSA, but the employer did nothing in response.  *Dole v. Elliott Travel & Tours, Inc.*, 942

F.2d 962, 967 (6th Cir. 1991); *see also Heath v. Perdue Farms, Inc.*, 87 F. Supp. 2d 452, 461-62

(D. Md. 2000) (finding that defendant's continued practice of classifying "chicken catchers" as

"exempt," even after the United States Supreme Court had found such employees were not

exempt, constituted "willful" conduct under the FLSA.)  Houston did not know whether any

DOL representative has ever communicated to PaRR that its retention of independent contractors

to perform disaster-related housing inspections was not lawful.  (Ex. "A;" Houston Dep. 86:12-

16.)  In fact, no DOL representative has ever suggested to PaRR that retaining housing inspectors

as Independent Contractors creates any FLSA problems.  (Ex. "J;" Klause Decl., ¶ 52.)

## V.   HOUSTON HAS NO EVIDENCE OF ANY VIOLATION OF THE FLSA, "WILLFUL" OR OTHERWISE.

Courts have found that the *McLaughlin* standard is not met where the plaintiff "only

speculates that the Company willfully attempted to conceal plaintiff's eligibility for overtime pay

by hiring him as an independent contractor."  *See, e.g., Gustafson*, 171 F. Supp. 2d. at 323.

Houston has admitted that he has *no* evidence at all that PaRR willfully attempted to conceal his

eligibility for overtime pay by hiring him as an independent contractor.  (Ex. "A;" Houston Dep.

85:4-8.)  The uncontradicted evidence in this case establishes that PaRR made deliberate and

conscientious efforts to ascertain—and to confirm—that its per-inspection payments to

independent contractors would fully comply with the requirements of the FLSA and the SCA.[10]

(Ex. "J;" Klause Decl., ¶¶ 14-26.) After that, PaRR actually published, on its secure website,

---

[10]  Courts have found that conscientious efforts such as those undertaken by PaRR do not constitute "willful" conduct.  *See Schneider v. City of Springfield*, 102 F. Supp. 2d 827, 835-40 (S.D. Ohio 1999) (granting defendant's motion for summary judgment on plaintiffs' "willfulness" claims, and finding that it had not acted "willfully" where defendant was unaware of any letter ruling, law, or regulation "which directly or indirectly" contradicted the defendant's employment practices and defendant had also consulted the FLSA, various handbooks and publications and the operative contractual agreements between the parties.)

Policy 001 which informed all of PaRR's independent contractors, Houston included, that the per-inspection rate paid to them included overtime. (Ex. "D;" Houston Response to RFA Nos. 19, 58, 59 and Ex. 19 to RFAs.) Houston has admitted that not only did he have access to PaRR's secure website, but that he also read Policy 001. (*Id.*; Houston Response to RFA Nos. 57-59.) Indeed, in Supplemental Answers to PaRR's First Set of Interrogatories, Houston has actually relied upon PaRR's per-inspection rate as containing an overtime component. (*See* Ex. "G;" Supp. Answer to Interrog. No. 3 at p. 6.) ("The per inspection fee paid by PaRR to its inspectors includes compensation for anticipated overtime, 'fairly substantial amount of overtime.'")

### A.   Uniform Industry Practice Over The Last Quarter Century.

As discussed above, before PaRR finalized its bid to FEMA, it was anxious to verify that it could comply with all applicable federal wage and hour laws. PaRR conferred with a senior wage and hour analyst at the DOL. He advised PaRR that nothing in the SCA prevented PaRR from retaining housing inspectors as independent contractors. This step went above and beyond what the courts require to negate a plaintiff's claim of willfulness. In *Hanscom v. Carteret Mortgage Corp.*, Civil Action No. 1:06-CV-2483, 2008 WL 4845832 (M.D. Pa. Nov. 5, 2008), the court declined to hold "that individual consultation with the Department of Labor is required to avoid a finding of willfulness" because to do so "would be a great imposition upon both the Department of Labor and employers." *Id.* at *5 (internal citations omitted). Nonetheless, PaRR did contact the DOL in this case.

In pre-contract discussions with FEMA, PaRR was required to demonstrate that its payments to inspectors would comply with the wage and benefit requirements of the SCA and the DOL Determination, and it was required to demonstrate that its proposed per-inspection fees included overtime. PaRR informed every inspector, including Houston, that the per-inspection

fee included the equivalent of an hourly wage, the monetary value of fringe benefits, *and overtime*.  (Ex. "J;" Klause Decl., ¶ 30.)  In this way, PaRR consciously and deliberately attempted to assure that every independent contractor received full compensation for any hours worked in excess of 40 in any week.  *See Anderson,* 1997 U.S. Dist. LEXIS 12690, at *16 (finding that there could, by definition, be no "willful" violation of the FLSA where the defendant had "attempted to comply with the FLSA by ostensibly paying the employees time and a half for their hours over forty").  This is the antithesis of "willful" conduct on PaRR's part to evade the requirements of the FLSA.

### B. Section 530 Of The Revenue Act Of 1978.

There is another, compelling, legal reason why there could not possibly be any "willful" violation of the FLSA in this case.  In Section 530 of the Revenue Act of 1978, "Congress provided that an individual whom the employer did not treat as an employee would be 'deemed not to be an employee' for tax purposes 'unless the employer had no reasonable basis' for that treatment of the individual."  *General Inv. Corp. v. United States*, 823 F.2d 337, 339 (9th Cir. 1987) (citing §§ 530(a)(1)(A) & (B) of the Revenue Act of 1978 (26 U.S.C. § 3401, note (1979).)  "Section 530(a)(2) provides that an employer's reasonable reliance on any of three supporting elements constitutes a reasonable basis for not treating an individual as an employee." *Id.*  "The third provision . . . *creates a conclusive presumption* that an employer had a reasonable basis for not treating an individual as an employee, if the employer did so in reasonable reliance on '*long-standing recognized practice of a significant segment of the industry* in which such individual was engaged.'"  *Id.* at 339-40 (emphasis added.)  "Without question, Congress intended to protect employers who exercised good faith in determining whether their workers were employees or independent contractors."  *Id.* at 340.

The uncontradicted evidence in this case, developed after discovery conducted by both parties, is that the "long standing recognized practice of a significant segment of the industry" was to use independent contractors, and not employees, to perform disaster-related housing inspections for FEMA and its predecessors.  (Ex. "J;" Klause Decl., ¶ 6.)  This had been the uniform practice in the industry for over twenty-five years before PaRR signed its first contract with FEMA in 2001.  (*Id.*)  Houston is not aware of any facts to the contrary.  (Ex. "A;" Houston Dep. 88:12-18.)  Thus, the *undisputed* evidence in this case is that *every* company that has provided disaster housing inspection services to agencies of the Federal Government for the last quarter century has retained independent contractors, not employees, to perform those services. (Ex. "J;" Klause Decl., ¶ 6.)  PaRR's reasonable reliance on the long-standing practice of the entire disaster housing inspection industry establishes, therefore, a "conclusive presumption" that it acted in good faith, as established by the authorities cited above.  This dissolves completely any suggestion of a "willful" violation of the FLSA on PaRR's part.

## CONCLUSION

Pursuant to Fed. R. Civ. P. 56(b), PaRR and Dewberry request this Court to enter an Order granting partial summary judgment in their favor on the "willfulness" claims made in Paragraphs 47, 48 and 84 of the Complaint, and to dismiss those claims with prejudice.

Respectfully submitted,

PARTNERSHIP FOR RESPONSE AND RECOVERY
DEWBERRY & DAVIS LLC


By:_____/s/_____
                Counsel

Stephen M. Sayers (VSB No. 23066)
Thomas P. Murphy (VSB No. 30765)
Michael E. Kinney (VSB No. 65056)
*Counsel for the Defendants,*
*Partnership for Response and Recovery and Dewberry & Davis LLC*
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
Telephone:  (703) 714-7400
Facsimile:  (703) 714-7410
ssayers@hunton.com
tpmurphy@hunton.com
mkinney@hunton.com

     - and -

James P. Naughton (VSB No. 25923)
*Counsel for the Defendants,*
*Partnership for Response and Recovery and Dewberry & Davis LLC*
HUNTON & WILLIAMS LLP
500 E. Main Street, Suite 1000
Norfolk, Virginia  23510
Telephone:  (757) 640-5300
Facsimile:  (757) 625-7720
jnaughton@hunton.com

## CERTIFICATE OF SERVICE

I certify that on the 6th day of February, 2009, I will electronically file the attached Brief

with the Clerk of the Court using the CM/ECF system, which will send a notification of that

filing (NEF) to the offices of the following:

Gary B. Mims (VSB No. 19184)
Steven M. Frei (VSB No. 32211)
Gobind S. Sethi (VSB No. 72266)
*Local Counsel for the Plaintiff, Ronald E. Houston*
HALL, SICKELS, FREI & MIMS, P.C.
12120 Sunset Hills Road, Suite 150
Reston, Virginia  20190
Telephone:  (703) 925-0500
Facsimile:  (703) 925-0501
gary.mims@hallandsickels.com
steve.frei@hallandsickels.com
gobind.sethi@hallandsickels.com

I also certify that I will send a copy of the attached Brief by U.S. Mail to the offices of the

following non-filing users:

Walter K. Lack (admitted *pro hac vice*)
Richard P. Kinnan (admitted *pro hac vice*)
Paul Allan Traina (admitted *pro hac vice*)
*Counsel for the Plaintiff, Ronald E. Houston*
ENGSTROM LIPSCOMB & LACK
10100 Santa Monica Boulevard, 12th Floor
Los Angeles, California  90067-4107
Telephone:  (310) 552-3800
Facsimile:  (310) 552-9434

Karl A. Gerber (admitted *pro hac vice*)
*Counsel for the Plaintiff, Ronald E. Houston*
EMPLOYMENT LAWYER'S GROUP
13418 Ventura Boulevard
Sherman Oaks, California  91423
Telephone:  (818) 783-7300
Facsimile:  (818) 995-7159
Facsimile:  (631) 247-0417

_____/s/_____
Michael E. Kinney (VSB No. 65056)
*Counsel for the Defendants,*
*Partnership for Response and Recovery and*
*Dewberry & Davis LLC*
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
Telephone:  (703) 714-7400
Facsimile:  (703) 714-7410
mkinney@hunton.com

- 24 -